UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------X

LUCIEN SALNAVE ,                                    :

                       Petitioner,            :

       -against-                           :    CV-08-5096

ROBERT ERCOLE, Superintendent of Green       :   (Vitaliano, J.)
Haven Correctional Facility, and ANDREW           (Reyes, M.J.)
CUOMO, Attorney General of New York,         :

            Respondents.                :

------------------------------------------------------------X


## PETITIONER'S MEMORANDUM OF LAW AND APPENDIX IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

                  LAWRENCE T. HAUSMAN (LTH 4542)
                  NANCY E. LITTLE (NL 4484)
                  THE LEGAL AID SOCIETY
                  Attorneys for Petitioner
                  Points I, II and III
                  199 Water Street, 5th floor
                  New York, New York 10038
                  (212) 577-3260

                  LUCIEN SALNAVE, pro se
                  Points IV and V

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................ 1

QUESTIONS PRESENTED ........................................................... 2

STATEMENT OF FACTS ............................................................. 2

Introduction ......................................................................... 2

The People's Case at Trial ...................................................... 3

    The Karlene Stewart Robbery ............................................. 3

    Herman Canjura and Manny Camano ................................... 7

    Yuri Khaimov ................................................................... 9

    The Police Investigations .................................................. 11

The Defense Case ................................................................. 15

    Tami Eldridge .................................................................. 15

    Preclusion of the Videotape .............................................. 22

The People's Rebutal Case ..................................................... 23

The Charge Conference ......................................................... 23

The Charge, Verdict and Sentence ........................................... 24

Subsequent State Court Proceedings ....................................... 25

ARGUMENT

POINT I
PETITIONER WAS DENIED HIS DUE PROCESS RIGHT
TO A FAIR TRIAL AND TO MEET THE ACCUSATIONS
AGAINST HIM WHEN THE COURT PRECLUDED HIM
FROM ELICITING THE DETAILS OF ELDRIDGE'S
STATEMENTS TO THE POLICE IN WHICH SHE
EXCULPATED PETITIONER. U.S. CONST. , AMENDS. VI,
XIV ............................................................................... 28

POINT II

 PETITIONER WAS DENIED HIS DUE PROCESS RIGHT
TO A FAIR TRIAL AND TO PRESENT A DEFENSE WHEN
THE TRIAL COURT (A) PRECLUDED HIM FROM
INTRODUCING EVIDENCE RELEVANT TO HIS DEFENSE
AND (B) FAILED TO CHARGE, AS REQUESTED, THAT
THE JURY HAD TO DETERMINE THE TRUTHFULNESS
OF PETITIONER'S CONFESSION BEFORE RELYING
UPON IT.  U.S. CONST., AMENDS. VI, XIV ............................................37

POINT III

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO
PROVE BEYOND A REASONABLE DOUBT THAT
PETITIONER WAS GUILTY OF THE STEWART ROBBERY
WHERE PROOF RESTED SOLELY UPON THE
TESTIMONY OF THE COMPLAINING WITNESS, WHOSE
OPPORTUNITY TO VIEW THE ROBBER WAS LIMITED
AND WHOSE DESCRIPTION OF THE ROBBER DID NOT
MATCH PETITIONER'S HEIGHT, ETHNICITY, AGE OR
FACIAL CHARACTERISTICS.  U.S. CONST., AMEND. XIV ................... 49

POINT IV

PETITIONER WAS DENIED HIS STATE AND FEDERAL
DUE PROCESS RIGHTS TO A FAIR TRIAL AND TO FAIR
NOTICE OF THE CHARGES AGAINST HIM UNDER THE
SIXTH AND FOURTEENTH AMENDMENTS OF THE
CONSTITUTION WHEN THE PEOPLE CHANGED THEIR
THEORY MID-TRIAL FROM PETITIONER BEING THE
PRINCIPAL PARTICPANT TO THEN BECOMING AN
ACCOMPLICE.  U.S. CONST., AMENDS. VI, XIV.................................... 56

POINT V

PETIIONER WAS DENIED HIS CONSTITUTIONAL SIXTH
AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF
COUNSEL U.S. CONST., AMEND. VI........................................................67

CONCLUSION .........................................................................................71

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------X

LUCIEN SALNAVE ,                                              :

                    Petitioner,         :

      -against-                                      :

ROBERT ERCOLE, Superintendent of Green        :
Haven Correctional Facility,  and  ANDREW S.
CUOMO, Attorney General of New York,          :

              Respondents.            :

---------------------------------------------------------------X

## PRELIMINARY STATEMENT

This memorandum is submitted in support of the petition of Lucien Salnave for a writ of habeas corpus, pursuant to 28 U.S.C. 2254.  Following a jury trial before Hon. William C. Donnino, in the Supreme Court of New York, Queens County, petitioner was convicted of murder in the second degree and three counts of robbery in the first degree.   He was sentenced, on December 10, 2003, to an aggregate prison term of forty years to life.

Petitioner appealed as a poor person to the Appellate Division: Second Department of the New York Supreme Court.  On June 26, 2007, petitioner's conviction was affirmed, and on September 24, 2007, leave to appeal to the New York Court of Appeals was denied.

Petitioner is now in custody of respondent Ercole.

## QUESTIONS PRESENTED

1.  Whether petitioner was denied his due process right to a fair trial and to meet the accusations against him when the court precluded him from eliciting the details of Eldridge's statements to the police in which she exculpated petitioner. U.S. Const., Amends. VI, XIV.

2.  Whether petitioner was denied his due process right to a fair trial and to present a defense when the trial court (a) precluded him from introducing evidence relevant to his defense and (b) failed to charge, as requested, that the jury had to determine the truthfulness of petitioner's confession. U.S. Const., Amends. VI, XIV.

3.  Whether the evidence was legally sufficient to prove beyond a reasonable doubt that petitioner was guilty of the Stewart robbery where proof rested solely on the testimony of the complaining witness, whose opportunity to view the robber was limited and whose description of the robber did not match petitioner's height, ethnicity, age, or facial characteristics. U.S. Const., Amend. XIV.

4.  Whether petitioner was denied his state and federal due process rights to a fair trial and to fair notice of the charges against him under the sixth and fourteenth amendments of the constitution when the People changed their theory mid-trial from petitioner being the principal participant to then becoming an accomplice. U.S. Const., Amends. VI, XIV.

5.  Whether petitioner was denied his constitutional sixth amendment right to effective assistance of counsel. U.S. Const., Amend. VI.

## STATEMENT OF FACTS

Introduction

Under Queens County indictment 1416/00, petitioner was charged with the gunpoint robbery of Preet Multani on June 3, 1999, of Karlene Stewart on June 9, 1999, and of Herman Camano and Manny Canjura on June 12, 1999, and with the felony-murder of Yuri Khaimov on June 16, 1999.  At trial, the People's evidence as to the Multani and Stewart robberies was based solely on the

2

complainant's identification of petitioner.[1]    The People also introduced identification testimony from Camano and Canjura and petitioner's alleged confession to those robberies and to shooting Khaimov.

The defense maintained that Stewart was mistaken in her identification of petitioner, given her initial description to the police, which did not match petitioner's features, and the lack of any corroborative evidence. It also argued that petitioner's confession was false, and called to the stand Tami Eldridge, originally not charged in the felony-murder, who admitted that she was the one who had stolen Khaimov's car and had shot him in order to eliminate him as a witness. However, the court's evidentiary rulings and its failure to charge on the truthfulness of petitioner's statement undermined petitioner's right to fairly and fully present his case.

<u>The People's Case</u>

<u>The Karlene Stewart Robbery</u>

On June 9, 1999, between 11:45 and midnight, <u>Karlene Stewart</u> got off the "F" train at 168th Street and Hillside Avenue. As she did every night, she went into the convenience store on the corner to buy a pack of cigarettes. It was very bright in the store (662-663, 674, 663).[2]

A young man entered the store and, according to Stewart, was "staring me down" as he walked to the back of the store to get a bottle of Corona. Stewart

---

[1]    Petitioner was acquitted of the Multani robbery; thus the testimony regarding that incident has not been summarized herein.

[2]    Unprefixed numerals or numerals preceded by a witness's initials refer to the pages of the trial transcript; the trial was held February 4 to March 14, 2003.

looked back at him, took notice, and continued to talk to the owner of the store, who was behind the counter at the front of the store.  The man bought his beer and walked out.  She again made eye contact with him as he left the store (663-664).    Nervous, Stewart did not want to leave "so I bought cigarettes" and smoked one while continuing to talk to the owner (663).

Stewart testified that "when [the man] left the store I didn't see where he went or whatever."  Asked by the prosecutor if she could see outside as she was talking to the owner, Stewart answered that she was able to see outside.  Asked if, while she was looking outside, she saw the man, Stewart said, "No."  Over objection, the prosecutor then asked if Stewart saw the man drinking a beer, Stewart said that the man stayed outside and drank the beer and she did not know where he went after that.  After remaining in the store for 10-12 minutes, Stewart looked out, saw no one there, and continued home (664-666, 676).

Stewart had not seen the man before he entered the store.  Stewart estimated that he was in the store for 7 to 10 minutes.  There were two other people in the store, to whom she paid no attention (675-676).

Stewart walked up to Highland Avenue and 165th Street, where she had to wait for the light to change.  She saw no one else on the street.  It was bright on the corner because of the street light (667, 676-677).

Stewart felt a gun directly behind her left ear.  Until then she had not seen or heard anything.  She turned and saw the man from the store, who told her to give him her pocketbook.  When Stewart did not respond, the man, with the gun still to her ear, repeated "bitch, give me your fucking pocketbook." Stewart said to

take the money but not the pocketbook, and the man pulled the bag off her shoulder and "took off" (667-669, 678-679). The robbery happened "really fast," and she had been frightened (679, 696). In her purse had been $300, credit cards and identification (669-670). Stewart went home and immediately called the police, who arrived in less than 5-6 minutes (680). She gave the police a description of a light-skinned man, who looked Hispanic, was 5'6", weighed 140-145 lbs., and had a goatee (673, 690-691).

On June 18th, at 12:40 a.m., Stewart went to the station house, viewed a line-up, and chose petitioner (670-672; Det. James Woods: 909, 922). She identified petitioner at trial as the robber (668).

At trial, Stewart described the robber as wearing a black hooded shirt and black sweat pants and carrying small silver gun (672). Although the man had his hood up, she could see his face and the top of the forehead area. There was nothing unusual about his face, he had a goatee, and his hair was short. He looked Spanish and was light-skinned. He had been standing right to next to Stewart, and he was a couple of inches shorter than she was, 5'6" to her 5'8." Of a medium build, he weighed between 140-145 lbs. Stewart estimated that the man was about 26 years old; she was 28 years old at the time of the robbery (673, 682, 690-695).

According to his pedigree, petitioner was 5'9," 160 lbs., and 19 years old (JW: 969, 988-989). According to Detective Woods, petitioner had short hair, no facial hair, and brown eyes (958-959). Defendant's exhibit A and People's exhibit 4, photographs taken at Central Booking, fairly and accurately depicted petitioner

on June 17. Woods initially stated that the photographs showed a scar on petitioner's left eyebrow; however, on re-direct examination, he said that he would not characterize it as scar, but rather as a "lighter appearance as if some hair was missing on small area of eyebrow" (963-967, 982-983, 987, 990). Detective John Reynolds testified that they were a fair and accurate picture of petitioner on June 18th and showed an "anomaly" in petitioner's left eyebrow (JR: 1183).[3]

Police Officer Elain Friedman testified for the defense. She had been a police officer for 13½ years. On June 10, 1999, she went to Stewart's apartment in response to a radio run at 12:24 p.m., arriving at 12:30 p.m. (1892, 1900). Friedman had no memory of the incident, and a copy of her handwritten report was entered into evidence as Defense exhibit D (1895-1896, 1987). It indicated that she had begun her interview at 12:30 p.m. and finished it at 12:54 p.m., as was confirmed by her memo book. She was sure that it occurred in the afternoon because the time was written in military time and because she regularly worked the 0705 to 1540 shift, which was 7:00 a.m. to 3:40 pm (1901, 1906, 1907; Defense exhibit D).

The recorded description of the perpetrator was male Hispanic, 26 years old, 5'5", 145 lbs., dark brown eyes, short black hair, goatee and Spanish accent (1989-1999; Defense exhibit D). Stewart had indicated that she had seen the robber on the subway platform; he followed her upstairs to the street; Stewart

---

[3]    The People also introduced into evidence petitioner's Louisiana identification card, which Detective Reynolds testified was a fair and accurate representation of petitioner on June 17th (1184-1185; People's exhibits 8 and 8A). People's exhibit 4 and People's exhibit 8 are page 33-34 of the attached Appendix, respectively.

went into the store; and, when she came out, the robber continued to follow her (1900; Defense exhibit D).

At trial, Stewart denied telling the police that she had seen the robber on the platform or that he had followed her to the store and then, when she came out, followed her home. Nor, she claimed, did she tell the police that the man was 5'5" or that he had Spanish accent (690-691).

According to Detective Woods, it was twelve blocks from the robbery location at 165th Street and the Jets Motel on 139th Street where petitioner had been arrested (929-930; People's exhibit 2: map). No black hooded shirt or black sweat pants were recovered from petitioner's motel room, and petitioner was wearing a short-sleeved red tee shirt and dark, knee-length shorts when arrested (JW: 936; JR: 1167; People's exhibit 4).

Herman Canjura and Manny Camano

On June 12, 1999, shortly after midnight, Herman Canjura and Manuel Camano were playing dice for money in front of Canjura's house on 139th Street. With them were Canjura's brother Oscar and a friend, June (HC: 699-700, 703, 725; MC: 765-766, 802-803).[4] It was a well-lit block (HC: 721-724; MC: 767).

A black man approached them and asked if he could get into the game They played, and conversed, for about fifteen minutes; Camano looked at the man the entire time (HC: 701-702, 745; MC: 767-770, 806, 864). When game stopped, Canjura grabbed the money he won and put it in his wallet; his pay was

---

[4]     After a hearing at which Oscar and June testified, the court granted the defense request to give a missing witness charge as to both men.

7

also in his wallet.  The man was right next to him (HC: 703-704, 741).

When the game was over, the stranger put his hand inside his shirt and said "I'm going to do this real quick and easy, I don't want anyone to get hurt," causing both Canjura and Camano to look at him as if he were crazy.  When Canjura started to move away, the man grabbed his arm, said "hold up" and pulled out a small silver-plated gun.  He cocked the gun, put it in Canjura's stomach and, said "yo give me all your shit."  Canjura pulled out his wallet and opened it, but nervously dropped it into the sewer.  The man, however, had already taken the money out of it and had pulled Canjura's chain off (HC: 704-707, 742-743; MC: 769-772, 803, 859).

The man then turned to Camano and demanded his gold bracelet.  Camano initially refused but handed it over, and the man walked away.  While Camano testified that he and the robber exchanged words for 10 minutes, Canjura estimated only a couple of minutes passed (HC: 707-709, 741-745; MC: 771, 774-775, 828).

The man started to walk towards Queens Boulevard, a short block away.  Canjura, Oscar and June followed him on foot, and the man, walking backwards and swinging his gun, told them to back up or he would start shooting.  Meanwhile, Camano got into his car and drove after the man (HC: 709-710, 718, 729-731; MC: 775-777, 805, 807).  The man started to walk toward Hillside Avenue, then crossed Queens Boulevard, and walked between a gas station and the Jets Motel toward the Van Wyck Expressway  (HC: 709, 711-712, 733-735; MC: 778-780, 795, 808-812).

8

Camano saw a police car and told Police Officer <u>Ike</u> <u>Dennis</u> that he had just been robbed by a black male (MC: 779-781, 813-814, 818-819; ID: 869, 873-875, 884). As they spoke, Camano said "there he goes." A man was 23 feet behind them on the service road of the Expressway, walking away from them (MC: 781-782, 795, 815, 824-826; ID: 870, 875; ID: 872, 875-876, 880, 885). When Dennis told the man to stop, the man ran and Dennis lost him (ID: 871-872).

The man had been wearing sweatpants, an orange bandana and either a long-sleeved dark blue sweatshirt or an oversized tee shirt. According to Canjura, the man was 5' 8-9" to Canjura's 5'4-5," and there was nothing unusual about the man's face. Camano described him as black, 5'6-10" tall and weighing 130-150 lbs. (HC: 705, 744-746; MC: 768, 785, 833, 861-862, 864). Officer Dennis did not see the man's face, but he was wearing an orange bandana, gray sweatpants, and a dark blue shirt (ID: 870-871, 881).

In a line-up on June 17th, Canjura and Camano identified petitioner as the robber. They also identified him at trial, Camano commenting that it was obvious where the accused person sat in the courtroom (HC: 701, 714-716, 747; MC: 783, 785, 841).

<u>Yuri Khaimov</u>

At 5:40 a.m., on June 16, 1999, Police Officer <u>Patrick</u> <u>Roach</u> responded to 167th Street and Captain Tilly Park where he saw a body laying on the grass with its head facing the park and its feet facing the street. The body had not been there when he had passed the spot at 12:15 a.m. and 12:45 a.m. (1102-1105, 1108).

Arriving at the scene at 7:15 a.m., Detective John DeSimone of the Crime Scene Unit observed a young white male, laying face down with his unshod feet crossed (1015, 1017-1019, 1021).  DeSimone photographed the body (1048-1055; People's exhibits 6A,D,E,F,G,I,J,K).  No shoes or ballistics were recovered at the scene, and there was no wallet or jewelry on the body (1021-1022, 1065).

Detective John Reynolds was assigned to investigate the homicide (1128). Albert Khaimov identified the body as his brother, Yuri (AK: 994, 1008-1009; JR: 1128-1129).  Albert had last seen Yuri on June 15 between 4:00 and 6:30 p.m.; Yuri was wearing a gold necklace and bracelet, green pants and shirt, and sandals.  At 6:30 p.m., Yuri drove his parents to the airport in their father's car, a white four-door BMW, depicted in People's exhibits 5 and 5A.  Later that night, Albert paged his brother, who called him back at 12:30 a.m., using a friend's cell phone.  Yuri said he was near home in Briarwood, was going to park the car, and would call him when he got home (994, 1003-1007, 1010-1013).

According to Dr. Kari Reiber of the Medical Examiner's Office, Dr. Hedda Jinrek performed an autopsy on Khaimov (1473, 1467-1471, 1500-1501; People's exhibit 17: report).  Khaimov had suffered two gunshots to the head (1474, 1480-1482).  One shot, which was a contact wound, entered the left cheek and exited the right cheek (1475-1476, 1483-1484, 1486-1489).  The other shot entered on the left side of back of head and lodged in the front of head on right side, at an angle higher than entry (1476, 1491-1494).  The bullet was recovered (1477-1480; People's exhibit 12).  This shot caused Khaimov's death (1500).  Jinrek did not indicate that this shot was a contact wound, although Reiber thought that it was

10

(1489-1490, 1504-1505).

Khaimov also had a small bruise on the front of his right shoulder, five small abrasions near his right elbow, and scratches on right shin and the top of his right foot.  The scratches were consistent with the skin being scraped on a sidewalk or curb (1474-1475, 1498-1499).

The Police Investigation

Detective James Woods was assigned to investigate the robberies of Multani, Stewart, Canjura and Camano and to assist in the homicide (890-894).  On June 17th, around 4:45 p.m., he arrested petitioner in his room at the Jets Motel (896-897, 905-906, 931-937).  Petitioner had registered on June 6th (925, 932).  Petitioner and the two young children in the room with him were brought to the precinct (906-908, 942).  No weapons were found in the motel room (937).

They arrived at the precinct around 5:45 p.m., and petitioner was placed in a line-up at 10:20 p.m. (908, 940; People's exhibits 3, 3A: line-up photographs).  The line-up participants were given hats to wear; petitioner's hat covered his left eyebrow (958, 961, 991).

At 2:00 a.m. on June 18, 1999, Detective Brian Quinn and his partner interrogated petitioner (1277-1278).  Quinn gave petitioner his Miranda warnings (People's exhibits 14, 14A) and told him that he had been picked out of the line-up,  that it did not look good, and that it was his chance to tell his side of the story (1279-1287, 1298, 1358-1360, 1390-1391).  Quinn asked petitioner questions, and petitioner told him what he had been doing the last month and admitted to robberies in a dice game (1298-1300, 1379, 1381-1382, 1391-1392).

Around 2:30 a.m., Quinn asked petitioner about an incident where a man's car was taken, and petitioner said that he did not know anything about it. Quinn asked about it a few times, and petitioner gave the same answer (1298-1301, 1387). Quinn did not take any notes or write out petitioner's statement regarding the robberies (1298, 1364, 1376, 1395).

In the meantime, Detective <u>Theodore Braun</u> waited for Tami Eldridge, petitioner's girlfriend, at the Jets Motel. She arrived at 3:00 a.m., and Braun told her that her children were at the precinct and that they would take her there. Asked if she had anything she should not, Tami handed over a set of keys which included a BMW key (1187-1189, 1193, 1202-1204; People's exhibit 10).

On the sidewalk outside the precinct, Tami told Braun that she had a gun under her left arm, in her bra. Braun removed the gun, a loaded .25 caliber semi-automatic with four rounds in the magazine, People's exhibit 11 (TB: 1191-1192, 1194-1196, 1199, 1204-1205, 1209; JR: 1137, 1169-1170).

Quinn subsequently returned to the interview room and told petitioner that it was all over – the police had Tami, the gun, the car, and the key. When petitioner said that they were "full of shit," Quinn showed him the gun and the key, and asked him about the incident. Shortly thereafter, petitioner allegedly told him about robbing and shooting Khaimov (1302-1305, 1365, 1399-1400, 1405-1406, 1409).

Quinn then wrote out petitioner's statement, People's exhibits 15A and 15B, as he repeated it (1307-1314). When he finished, Quinn read it to petitioner who signed it (1315). According to Quinn, petitioner said that:

12

On or about 6/7/99 myself Tami Eldridge who is my girlfriend and her two children Laquiente, Ladaysha, got a room at the Jet Motel. We had gotten the room as we were awaiting my court date in Queens County, my court date was scheduled for July 12, 1999 and Tami and I were debating whether to wait for the date or go back to Louisiana and return on the court date. We were paying $85 a day for the room at the Jet Motel and we also owed $840 in rent plus gas and electric back in Louisiana. After a couple of days things were getting tight. I left the hotel one night to think about what we were going to do. After a short time I saw a group of guys playing dice on the street and I joined in the game after losing a couple of dollars I took out the silver .25 cal automatic from my waistband and told the group "give me your money and jewelry I don't want to hurt anyone["]. Two males gave me cash ($125) and a gold chain and bracelet that I sold the next day for about ($125). I bought this gun from a guy on the street for $130 and he told me it was clean. After robbing these males I ran away and they chased me for a short distance but I was able to lose them.

When I got back to the hotel I told Tami that I got some money for us by doing a robbery. When I would do these robberies the gun always had the safety on. When I got back to the hotel I told Tami what had happened. A couple of nights later I again went out to get some money I saw a guy parking his car and approached him. I open his driver's door showed him the gun in my hand and said Give me your money I don't want to hurt you. He started to struggle and I pushed him in the car and got in and started to drive away. He had given me his wallet and I was telling him that I would drop him off and leave his car in the area. As I got near the park by Jamaica H.S. this man started to struggle with me and grabbed the gun, I stepped on the brakes and took my hand off the wheel tried to regain control of the gun. The gun went off and struck the man in the head. I then shot him again in the head and put the car in park[]. I exited the vehicle and dragged the man from the car and laid him down in the park. I then drove away and threw the mans sandals out the window. I drove back to the hotel and parked the car went inside and told Tami

13

what happened.  The next day I went out and bought a
gallon of water and cleaned the car using two shirts
that were in the car as rags.  When I was not using the
car I would park it behind the motel.

(1305-1306, 1316-1318; People's exhibit 15).  The interrogation ended between

6:00 and 7:00 a.m. (1427).  At 9:00 a.m., Quinn showed petitioner a photograph

of Khaimov, and petitioner said that it was the person whose car he took or the

man he shot (1345-1348, 1427-1431).

Detective Walter Lopez examined the BMW a little after 9:00 a.m. (WL:

1519-1521).  Lopez first photographed the car (WL: 1528-1544; People's exhibits

18A-T).  He then collected five pieces of blood evidence; it amounted to a few

drops of blood (WL: 1525-1527, 1562; People's exhibits W1-W5).  There was blood

on a sweatshirt in the front seat; on the front passenger seat; in the front

passenger foot well; and on the front passenger door.  A swipe mark was on the

bottom corner of the rear seat behind the front passenger seat; it had either been

transferred on by a swipe or, more likely, was already there and wiped off (WL:

1524-1549; JR: 1140-1141).   The DNA analysis showed that the blood was

consistent only with Khaimov (Stipulation: 1591).

Lopez lifted 17 fingerprints from the car.  Four were of value: none were

petitioner's and one on the trunk was Eldridge's (WL: 1523-1524, 1550-1557;

Stipulation: 1655).  No ballistics evidence was found in the car (JR: 1172; WL:

1564).

On June 18th, Reynolds went to petitioner's room at the Jets Motel to

execute a search warrant (1144, 1166).  In a pile of bags next to the dresser, the

14

searching detective found a Louisiana identification card for petitioner (People's exhibits 8A and 8B), an orange bandana, and a blue bandana (People's exhibits 9A and 9B) (1145-1148, 1152). Reynolds, who was watching, believed they came out of the same bag (1146). The items were sent for forensic testing (1155).

The police also recovered $107 from a drawer in the night table (1155). There was other clothing in the room, but the police did not take any (1167).

According to Detective Robert Freese, a firearms analyst, the gun recovered from Eldridge was an operable .25 caliber firearm, and the bullet received from the medical examiner's office had been fired from it (1226-1229, 1252-1255, 1262).

The Defense Case

Tami Eldridge testified that she was 29 years old, had two daughters, and had known petitioner, who was her boyfriend, since September 1998 (1692-1693, 1721). She was currently serving a sentence for a conviction for attempted murder (1693-1694).

On June 6, 1999, Eldridge, petitioner, and her two children checked into the Jets Motel (1694). Defense exhibit A reflected how petitioner looked in June 1999, and showed the three slashes in his eyebrow (1695-1698). In June, she had told petitioner that she was pregnant with his child; it turned out not to be true (1698, 1727).

Eldridge recognized Yuri Khaimov, shown in People's exhibit 7. She had shot him twice with the gun in evidence as People's exhibit 11 (1699-1700). The gun was hers, and she kept possession of it at all times (1700-1701, 1710-1713).

15

On June 18th, at the precinct, she gave the gun to the police and was arrested for possession of a weapon (1701, 1708-1710). Prior to going to the precinct, she had been driving Khaimov's car; the sweatshirt in it was hers (1703-1704).

She was not charged with Khaimov's murder until after she spoke to Detective Reynolds and the prosecutor on January 15, 2002, and confessed to the shooting (1704-1705). On August 13, 2002, she pleaded guilty to Khaimov's murder (1704, 1804-1805).

On cross-examination, Eldridge testified that she had met petitioner in September 1998, and they began to live to together in her apartment in Brooklyn; she was 25 years old and he was 18 (1721, 1724-1725). She had previously been in a relationship for seven to eight years with Cornell Bradley, who was the father of her children. She had ended the relationship, but declined to answer whether she had shot him in the stomach (1721-1723). Eldridge, her daughters and petitioner moved to Louisiana, where Eldridge had family (1725-1726, 1740). Eldridge acknowledged that petitioner's love was very important to her and that she had referred to herself as Mrs. Salnave (1727-1739).

In June 1999, Eldridge, her daughters and petitioner was staying at the Jets Motel. The motel cost $85 per night, her children had to be fed, and she and petitioner did not have jobs in New York (1740-1741).[5] They had come to New York because petitioner had a court date (1802-1803).

---

[5]    On direct examination, Eldridge had testified that she had money with her when she came up from Louisiana, and the court sustained the prosecutor's objection to defense counsel then asking Eldridge if she had obtained any money from her relatives in New York (1702). On cross-examination, the prosecutor then elicited the information about the cost of the motel and lack of jobs.

Asked if she had left the Jets Motel with petitioner the night of the shooting, Eldridge said no and then indicated that she was not going to answer that "as part of my plea" (1744). After a recess, Eldridge's attorney indicated that he had told Eldridge about the penalties if she refused to testify or if her testimony was inconsistent with her plea allocution. He also indicated that he had not anticipated her refusal (1745-1752). Eldridge told the court that she had to say petitioner was present "in order to get her plea" and that she was refusing to testify further so that she would not contradict her plea (1755). After an overnight recess, Eldridge indicated that she would continue to testify (1775).

The next day, still on cross-examination, Eldridge was asked if petitioner was present, and she answered "as part of my plea, yes" (1780-1781). They had left the motel together, and Chris Baksh stayed with the girls (1781). Eldridge planned to steal a car but had not discussed it with petitioner, and petitioner did not know that she had a gun with her (1781-1784). She acknowledged that this contradicted her plea allocution (1782-1785). She wanted a car because she had had enough of New York and wished to return to Louisiana (1802-1803, 1808). Petitioner did not know how to drive, but she was teaching him (1704-1705, 1787).

Eldridge left the motel and walked up a hill towards Briarwood (1785-1786). She spotted Khaimov driving a white BMW and watched him circle the block for a parking spot (1786). When he parked the car, she walked over to the driver's side of the car, put the gun to his head, and told him to slide over. She got into the car. Asked by the prosecutor if petitioner got into the back seat

behind Khaimov, Eldridge said, "After I directed him to, yes" (1786-1787).

After telling Khaimov to put his seat belt on, Eldridge drove around for more than a half hour, in order to calm down Khaimov and because she had not decided what to do with him (1788, 1790-1791). He kept saying "don't hurt me," and told Eldridge that his parents were not at home and she could rob their apartment and that his brother was a police officer and they would be looking for him. She looked in his wallet and saw a police badge medallion (1788-1789, 1791). Eldridge had Khaimov take his chain and bracelet off. Later, she gave the jewelry to petitioner but she did not know what happened to it (1789-1790, 1801).

Annoyed with Khaimov for crying and begging her to let him out and not wanting to leave an eyewitness, Eldridge, driving very slowly, pressed the gun against the side of his left temple and shot him (1792, 1803-1804). Asked if petitioner was still in the car, Eldridge said "yes" (1793). Khaimov's head hit the dashboard, and there was a large amount of blood (1793). Eldridge pulled over to the side of the road and pulled Khaimov out of the car, leaving him on the grass by the curb (1794-1795). Asked if petitioner helped to move the body, Eldridge said no, but agreed with the prosecutor that he had gotten out of the car (1794). Khaimov was still alive, so Eldridge bent over and again shot him in the head (1795-1796).

Asked if petitioner then took Khaimov's wallet, Eldridge said "yes" (1796). She agreed with the prosecutor that they then left, with petitioner in the back seat. Eldridge threw Khaimov's shoes out of the window (1796-1799). At a gas station, Eldridge cleaned up the car and got rid of the shell casing (1797-1798).

18

She placed her sweatshirt on the front seat to cover the blood (1703-1704, 1798-1799). When they arrived back at the motel, Eldridge did not offer Baksh a ride (1803).

On re-direct examination, Eldridge repeated that she had given the prosecutor and police a statement in January 2002 (1806). The statement, about the events leading up to Khaimov's death and including the conversations in the car, had been taped, and she had been given her <u>Miranda</u> warnings (1807-1808). She truthfully said that petitioner had not been with her during the robbery and had nothing to do with it (1807, 1809-1810). She knew that if she had not confessed, she would not have been charged with the murder (1809).

Her plea bargain allowed her to receive a sentence of 15 years to life, the lowest sentence possible (1810). It would also run concurrently with the five-year sentence that she was currently serving (1810-1811). To receive the deal, however, she had to say that petitioner had been present during the robbery (1812).

The prosecutor began her re-cross examination by asking Eldridge numerous times and in different forms whether petitioner was or was not present during the shooting; each time Eldridge answered that she was not going to contradict her plea (1813-1819). She then asked Eldridge if petitioner had been present when she told Khaimov to get into the car, when she was driving with the gun, when she asked for the jewelry, when she fired the first shot, when she pulled Khaimov out of the car, and when she fired the second shot (1825-1839).[6]

---

[6]    At the beginning of this questioning, counsel objected on the ground that the questions had

19

The prosecutor elicited how Eldridge had managed to get Khaimov on the ground (1832-1838).

Counsel then elicited from Eldridge that she had left Khaimov right on the curb because she could not drag him any further by herself (1856-1858).

Counsel then began to ask Eldridge about her statement to the prosecutor in January 2002. When the prosecutor objected, a side-bar was held (1858). Counsel requested that he be allowed to elicit the specifics of Eldridge's January 2002 statement that were inconsistent with her testimony during the prosecutor's examination. He noted that, on re-direct examination, he had brought out only that in that statement Eldridge had said that petitioner was not present. He now wanted to elicit the actual questions and answers (1859-1863).[7]

The court stated that it had already allowed counsel to bring out Eldridge's failure to implicate petitioner in her January 2002 statement as inconsistent with the prosecutor's line of questioning. The court indicated that counsel now wanted to bring out consistent statements (1863).

Counsel responded that the prosecutor in her last examination had repeatedly tried to get Eldridge to say that petitioner was present during the robbery. He had objected to the questions as already asked as answered. He wanted to respond by asking about the specifics in the January 2002 statement. These would include Eldridge's answers regarding where petitioner was during the robbery, that he was in the motel when she returned, that she threw the

---

been asked and answered. His three objections were overruled (1825-1829).

[7]    Eldridge's statement is contained in the Appendix, pages 1-32.

20

wallet on the dresser and petitioner asked her about it, that she showed him the jewelry and he asked where it came from, and the details of the homicide which indicated that petitioner was not present. These answers were inconsistent with Eldridge's testimony during the People's examinations (1863-1987).

The prosecutor opposed counsel's request. She argued that Eldridge was a defense witness who, on direct examination, had only been asked if she shot Khaimov. The prosecutor said that she therefore had to ask questions about petitioner's participation in the robbery and the murder. The prosecutor argued that counsel wanted to bolster Eldridge's testimony with prior consistent statements that, she claimed, did not go to any issues on re-cross examination (1867-1871).

Counsel responded that he had limited his questions to Eldridge to those to which he believed she would respond truthfully, and he pointed out that the prosecutor has chosen not to mention that someone else had confessed to the shooting. The prosecutor had adopted Eldridge for the areas that he had not gone into. He simply wanted to bring out prior statements that were inconsistent with Eldridge's testimony brought out by the People (1872-1873).

The court denied counsel's application (1875).

Defense counsel then asked Eldridge what she meant when she answered "according to my plea" in response to the prosecutor's questions. She explained that if she testified at trial differently than what she had told the plea court, she would either have to go to trial or receive an increased sentence, which could be considerably longer that fifteen to life and could be consecutive to the five-year

21

sentence she was serving (1876-1877).

### Preclusion of the Videotape

During the testimony of Detective Quinn, defense counsel indicated that he wanted to put into evidence the videotape of petitioner's precinct interview with the prosecutor, during which he unequivocally invoked his right to counsel (1320, 1332).[8]  Counsel argued that it was relevant to the statement petitioner had made earlier to Quinn: whether that statement was given freely and voluntarily and whether petitioner had made a knowing and intelligent waiver of his Miranda rights (1320-1321). Counsel pointed out that the only evidence before the jury regarding the earlier Miranda warnings was Quinn's testimony and the videotape offered the only independent evidence. He also noted that the defense was not conceding that Quinn had advised appellant of his rights (1332-1333).

The prosecutor objected, arguing that: the videotape was hearsay; it was not relevant to the voluntariness of appellant's earlier statement; the invocation of the right to counsel was questionable; and any relationship to the earlier Miranda warnings was speculative (1323-1325, 1334-1335).

The Court asked how the videotape at 9:21 a.m. was relevant to appellant's state of mind at 2:00 a.m. when he allegedly waived his Miranda rights. Counsel argued that the time lapse went to the weight of the evidence, not its admissibility; that the interrogation had ended not that much earlier; and that

---

[8]    A transcript of the tape was marked as Court exhibit 2 (1374-1375).  It shows that appellant was advised of his Miranda rights and says either "yes" or "I understand" to each of them.  Asked if he was willing to speak about the incident, appellant answered "fine."  The prosecutor says "pardon," and appellant says "can I get an attorney."

the videotape did not have to relate back to 2:00 a.m. but only to some of the questioning (1335-1340).

The court ruled that counsel could not introduce the videotape. It held that, given that seven hours had elapsed, the videotape did not "permit any reasonable fair inference as to his state of mind or what he said seven hours earlier" (1375-1376). Counsel excepted to the ruling, arguing that the court had made a finding of fact, rather than a finding of law (1376).[9]

The People's Rebuttal Case

On June 15, 1999, petitioner asked Christopher Baksh to babysit for Tami's two children (1954). Baksh considered himself a good friend of petitioner's, whom he had known since they were sophomores in high school (1953). He had seen petitioner and Tami in May 1999 (1953-1954). Baksh arrived at the Jets Motel at 9:00 p.m., and petitioner and Tami left together soon thereafter (1954-1955, 1957).

At 5:00 a.m., there was a knock on the door, and petitioner and Tami were there. They came into the room, pacing back and forth (1955). Baksh and petitioner went to the front of the hotel, and Baksh asked what had taken so long. Petitioner said that "some crazy shit happened" (1956). Petitioner offered Baksh a ride. Baksh declined and took the train home (1956-1957).

The Charge Conference

During the charge conference, defense counsel requested a charge on the

_____

[9]    In response to petitioner's post-verdict motion, the court reiterated its holding but also noted that the invocation of counsel was "questionable" and irresolute.

23

voluntariness of petitioner's statement, in that he did not make a knowing and intelligent waiver of his <u>Miranda</u> rights. He also requested that the court charge on the People's burden of proving the truthfulness of the statement (1969). The prosecutor opposed the request for the voluntariness charge, but stated that she may not object to a basic charge that a defendant must be afforded his rights (1981-1983). The court asked counsel if he would be satisfied with a charge that statement had to be voluntary, truthful to the extent relied upon, and preceded by <u>Miranda</u> warnings which defendant must have understood and waived (1983-1984).

The court then explained that it would be a charge that the jury had to find beyond a reasonable doubt that the defendant made the statement and did so voluntarily, in that he was given his <u>Miranda</u> rights and understood them (1984-1985). The prosecutor protested (1985-1987), and added that, since it was the People's burden to prove the statement is truthful, she wanted the specific language " in whole or in part" (1987). The court indicated it was the same as saying truthful to the extent relied upon and indicated that the parties would see the charge (1987-1988). Counsel subsequently repeated that it was the prosecutor's burden to prove beyond a reasonable doubt the voluntariness of the waiver of the <u>Miranda</u> rights and the truthfulness in whole or in part of the statement (1990).

<u>The Charge, Deliberations, Verdict and Sentence</u>

The court charged that jury regarding petitioner's statements related to the crimes of June 12 and June 19. It instructed the jury that, before considering

24

the statements, the jury had to be convinced beyond a reasonable doubt that the petitioner made the statements and that petitioner had done so voluntarily. The charge did not mention the jury's consideration of the truth or falsity of the statement (2221-2222).

The jury acquitted petitioner of the robbery of Preet Multani; convicted him of three counts of robbery in the first degree, relating to Stewart, Camano and Canjura; and convicted him of felony-murder (2291-2292).

The court sentenced petitioner to a determinate sentence of 8 years for the Stewart robbery, two determinate terms of 12 years for the Canjura and Camano robberies, and 20 years to life for the felony-murder. The sentences for the three incidents were to run consecutively, for an aggregate term of 40 years to life (page 14 of sentencing minutes).

Subsequent State Court Proceedings

On appeal to the Appellate Division: Second Department, petitioner argued in his brief, *inter alia*, that petitioner's guilt of the Stewart robbery was not proven beyond a reasonable doubt; that he was denied his due process right to a fair trial and to present a defense when the trial court precluded testimony challenging the reliability of his statement and failed to instruct the jury on the truthfulness of the statement; and that he was denied his due process right to a fair trial when the court precluded him from eliciting Eldridge's precinct statements. In a *pro se* supplemental brief, petitioner argued, *inter alia*, that he had been prejudiced by the variance between the theory of the crime presented to

the grand jury and theory adopted at trial and that he had been denied the effective assistance of counsel.

On June 26, 2007, the Appellate Division affirmed petitioner's conviction. People v. Salnave, 41 A.D.3d 872 (2nd Dept. 2007). In relevant part, the Court held that:

> The defendant's contention that the evidence was legally insufficient to establish his identity as the perpetrator of the June 10, 1999, robbery is unpreserved for appellate review (*see* CPL 470.05[2]; *People v. Gray*, 86 NY2d 10, 190. In any event, viewing the evidence in the light most favorable to the prosecution (*see People v. Contes*, 60 NY2d 620), we find that it legally sufficient to establish the defendant's guilt beyond a reasonable doubt (*see People v. Antonelli*, 6 AD3d 543; *People v. Betts*, 282 AD2d 539, 540). Moreover, upon the exercise of our factual review power (*see* CPL 470.15[5]), we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v. Romero*, 7 NY3d 633).
>
> The Supreme Court did not err in precluding the defendant from admitting into evidence a videotape of an aborted conversation between the defendant and an assistant district attorney, which occurred hours after the defendant completed his statement to detectives confessing to some of the crimes, where the defendant stated: "Can I get an attorney?" The videotape had slight, if any, relevance to the voluntariness or reliability of the defendant's statements or of the written waiver of the defendant's Miranda rights (*see Miranda v. Arizona*, 384 U.S. 436), which was signed about seven hours before the videotaped interview began (*see People v. Primo*, 96 NY2d 351, 355; *People v. Smith*, 300 AD2d 603, 603-604).
>
> The defendant's contention that the trial court erred in instructing the jury that his confession should be considered as evidence if the statement was found to have been voluntarily made, without also instructing

26

the jury that it must also consider the truthfulness of the statement is unpreserved for appellate review (*see* CPL 470.05[2]). Although the defendant requested a voluntariness charge which included an instruction on the jury's evaluation of the truthfulness of the statement, the defendant did not object to the voluntariness charge prepared by the court in respondent to the defendant's request (*see People v. Whalen*, 59 NY2d 273, 280).

Contrary to the defendant's contention, the trial court did not unconstitutionally preclude him from confronting his own witness with a prior inconsistent statement (*see Chambers v Mississippi*, 410 US 284, 297-298). The defendant's counsel repeatedly elicited from the witness the relevant portions of the prior statement on redirect examination. Because further questioning with regard to the statement on the second round of redirect examination would have been repetitive, the court had discretion to limit such questioning (*see Delaware v. Van Arsdall*, 475 US 673, 679; *People v. Melendez*, 55 NY3d 445, 451-452) .

The Court also stated that petitioner's other contentions were without merit.

Leave to appeal to the New York Court of Appeals was sought, petitioner again raising the claims contained in his main brief and *pro se* brief. Leave was denied on September 24, 2007. People v. Salnave, 9 N.Y.3d 872 (2007).

27

ARGUMENT

POINT I

PETITIONER WAS DENIED HIS DUE PROCESS
RIGHT TO A FAIR TRIAL AND HIS RIGHT TO
CONFRONT THE ACCUSATIONS AGAINST HIM
WHEN THE COURT PRECLUDED HIM FROM
ELICITING ELDRIDGE'S PRE-TRIAL STATEMENTS
THAT WERE INCONSISTENT WITH HER
TESTIMONY ON CROSS- AND RE-CROSS
EXAMINATION WHICH INCULPATED
PETITIONER. U.S. CONST., AMENDS. VI, XIV.

Tami Eldridge took the stand as a defense witness to testify that she had
shot Yuri Khaimov. Such testimony supported the defense argument that
petitioner's confession was false and should not be used by the jury, leaving the
People with no other direct evidence connecting petitioner with the crime. In
response, the People did not contest that it was Eldridge who did the shooting,
but attempted to elicit from her that petitioner was a participant in the robbery.
The court instructed the jury that this testimony could be used as substantive
evidence against petitioner, yet did not permit petitioner to impeach it with
Eldridge's prior inconsistent statements. Precluded from a full opportunity to
meet the People's case, petitioner was denied his due process right to a fair trial.
U.S. Const., Amends. VI, XIV.

A criminal defendant's right to due process "is, in essence, the right to a
fair opportunity to defend against the State's accusations." Chambers v.
Mississippi, 410 U.S. 284, 294 (1973). Thus, crucial to due process and a fair trial
is the right to confront and cross-examine the witnesses against him. Id. at 294,
295. Moreover, implicit in the sixth amendment right to confrontation is a

28

defendant's right to cross-examine the witnesses against him. <u>Pointer v. Texas</u>, 380 U.S. 400, 401, 404, 406-407 (1965).

Cross-examination is essential to promote reliability in the truth-finding function of a criminal trial, and it is the "principle means by which the believability of a witness and the truth of his testimony are tested." <u>Davis v. Alaska</u>, 415 U.S. 308, 316 (1974). Indeed, the Supreme Court has called cross-examination "the 'greatest legal engine ever invented for the discovery of truth,'" <u>California v. Green</u>, 399 U.S. 149, 158 (1970), quoting 5 J. Wigmore, <u>Evidence</u>, §1367 (3d ed. 1940), while the Second Circuit has characterized "[f]ull and fair full cross-examination" as the "cornerstone of the adversary system." <u>United States v. Fitzpatrick</u>, 437 F.2d 19, 23 (2nd Cir. 1970).

The right to cross-examination is not absolute. A court may impose "reasonable limitations" on cross-examination based upon, "among other things, harassment, prejudice, confusion of the issues, the witness' safety or interrogation that is repetitive or only marginally relevant." <u>Delaware v. Van Arsdall</u>, 475 U.S. 673, 679 (1986); <u>accord</u> Davis v. Alaska, 415 U.S. at 316 (court has "broad discretion to preclude repetitive and unduly harassing interrogation"). However, "wide latitude should be allowed in defense cross-examination regarding the credibility of government witnesses." <u>United States v. Fitzpatrick</u>, 437 F.2d at 23. A defendant may not be prohibited from exposing the jurors to facts from which they, "as the sole triers of facts and credibility, could appropriately draw inferences relating to the reliability of the witness." <u>Davis v. Alaska</u>, 415 U.S. at 318; <u>accord</u> Howard v. Walker, 406 F.3d 114, 129 (2nd Cir.

2005).

Finally, a defendant's confrontation rights do not turn on which party first called the witness to the stand.   In <u>Chambers</u>, the defendant called to the stand a individual who had previously confessed to the murder for which the defendant was charged.  After his written confession was introduced into evidence on direct examination, the State elicited on cross-examination, that he had recanted his confession, the motive for the confession, and the witness's actions the night of the murder.  Mississippi rules against impeaching one's own witness, however, barred the defendant from exploring the witness's three oral confessions or otherwise challenging the renunciation of the written confession.  <u>Chambers</u> v. <u>Mississippi</u>, 410 U.S. at 291-294, 297.

The Supreme Court held that the defendant had been denied his fundamental right to cross-examination.  It rejected the State's argument that the defendant's confrontation rights were not implicated because the witness was not "against" or "adverse to" the defendant, finding that the witness's testimony damaged the defense case.  <u>Id</u>. at 297.  The Court continued:

> The availability to the right to confront and cross-examine those who give damaging testimony against the accused has never been held to depend on whether the witness was initially put on the stand by the accused or by the State.  We reject the notion that a right of such substance in the criminal process may be governed by that technicality or by any narrow and unrealistic definition of the word 'against.'

<u>Id</u>. at 297-298.

Here also, the defense called Tami Eldridge to the stand to testify that she had shot Yuri Khaimov.  This testimony strongly supported the defense argument

that petitioner's confession was not truthful and could not be relied upon by the jury. On cross-examination and again on re-cross-examination, the prosecutor chose to ask Eldridge about the details of the robbery and killing of Khaimov, specifically and repeatedly asking whether or not petitioner had been present and aided in the robbery and murder. At times, the prosecutor elicited that petitioner had entered the car with Eldridge; that he had been present when she took the jewelry and shot Khaimov; that he had gotten out of the car with her; and that he had taken Khaimov's wallet. The court instructed the jury that this testimony, if corroborated, could be used as substantive proof against petitioner.

In response, defense counsel wanted to impeach this testimony with statements made during Eldridge's January 2002 confession. Davis v. Alaska, 415 at 316 ("cross-examiner has traditionally been allowed to impeach, i.e. discredit, the witness"). A witness's prior inconsistent statements are admissible at trial because "placing the inconsistency before the jury served the truthtesting function of cross-examination." People v. Hults, 76 N.Y.2d 190, 197-198 (1980). The inconsistent statements at issue here would include Eldridge's explanation of where petitioner was during the robbery and why they were not together that night; the particulars of what occurred when she returned to the motel where petitioner was, threw the wallet on the dresser and petitioner asked her about it; and the conversation they had the next day when he first saw the stolen car. Moreover, the details of the homicide which indicated that petitioner was not present, including Eldridge's retrieval of the wallet from Khaimov's pants pocket, could have been elicited by counsel.

31

The court, however, erroneously precluded petitioner from asking any of these questions. The court's limitations on petitioner's examination of Eldridge deprived him of his constitutional rights to a fair trial and to confront the witnesses against him. <u>Chambers</u> v. <u>Mississippi</u>, 410 U.S. at 298. That petitioner put Eldridge on the stand did not defeat his right to cross-examine her. On direct, Eldridge testified only that she had shot Khaimov, evidence petitioner's confession was untruthful and could not be used by the jury. In response, the government did not attempt to establish that Eldridge was not the shooter – indeed, they could not as it was the factual basis of her plea of guilty to murder in the second degree. Rather, they attempted to establish through Eldridge that petitioner was also a participant in the robbery and thus guilty of felony-murder. The jury was permitted to use Eldridge's testimony on cross-examination as substantive evidence against petitioner. Thus, as counsel argued, Eldridge became a witness against petitioner and, in order to meet the People's evidence, petitioner should have been able to impeach her with statements inconsistent with the People's case.

While a trial court may impose "reasonable limits" based upon concerns about harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant, <u>Delaware</u> v. <u>Van Arsdall</u>, 475 U.S. at 679, none of those concerns are present here. Rather, petitioner wanted to impeach Eldridge's testimony regarding petitioner's alleged participation in the crime, and the questions he proposed were not cumulative or repetitive.

The trial court found that it had been sufficient for petitioner to simply

32

elicit that Eldridge had told the police that petitioner was not with her during the murder and had nothing to do with it or the robbery. Yet, that limited testimony did not fully reflect her statement and failed to give a fair picture of it. There were, in fact, numerous references to petitioner in the statement about where he was when, about what he knew, and about what he had not done. Without hearing these statements, the jury would not have understood that Eldridge's prior statement exculpating petitioner was not a simple denial, but contained a coherent narrative and complete answers. Indeed, the trial court's characterization of the statement, which encompassed 32 pages of questions and answers, as a "failure to implicate" petitioner demonstrated the importance of admitting the details of the statement.

The trial court's limitation on petitioner's examination of Elridge was also unreasonable because it contrasted sharply with the license given the prosecutor. On her re-cross examination of Eldridge, the prosecutor did not stop with asking her numerous times whether petitioner was present during the shooting. Over defense counsel's objections that the questions had been asked and answered, she was also permitted to ask, as she had on cross-examination, about the details of the offense and petitioner's presence at various times. Petitioner should have been afforded the same latitude.

The court's error cannot be deemed harmless.[10] Initially, in assessing the harm, it should be assumed that "the damaging potential of the cross-examination w[as] fully realized." <u>Delaware</u> v. <u>Van Arsdall</u>, 475 U.S. at 684;

---

[10]    Moreover, in assessing the harm, the court should also consider the cumulative impact of the errors raised in this Point and Point II.

accord Benn v. Greiner, 402 F.3d 100, 105-106 (2nd Cir. 2005). Thus, assuming that the jury found Eldridge's testimony about petitioner's presence during, or participation in, the robbery not credible[11], the government had only weak evidence linking him to the crime. His alleged confession to the crime was proved false by Eldridge's testimony that she shot Khaimov. The particulars of the robbery and the chilling details of the murder -- shooting Khaimov first because he annoyed her and then to leave no witness -- could leave no doubt as to her actions, for which she had already pleaded guilty.

Although in summation the government argued that petitioner had helped Khaimov with the robbery, there was little evidence of his participation. There was no corroborating evidence -- the police did not fingerprint the gun or the BMW keys, and the fingerprints and blood recovered from the BMW matched only Khaimov or Eldridge. Nor was there any evidence that Eldridge could not have committed the crime by herself. Indeed, the government's original position was that only one person was involved.

Moreover, defense counsel argued that the confession was also false as to the Canjura and Camano robberies, and he called into question their identifications. Thus, the error also had an impact on those convictions.

Thus, the error "had substantial and injurious effect or influence in determining the jury's verdict" and actually prejudiced petitioner. Brecht v. Abrahamson, 507 U.S. 619 (1993).

---

[11]    Of course, that Eldridge inculpated petitioner at trial because her plea agreement required it also impacted on her credibility.

34

\*        \*        \*

A writ of *habeas corpus* may not issue on behalf of a state petitioner with respect to any claim that was adjudicated on the merits in the state court unless that adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established Federal Law as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1); Williams v. Taylor, 529 U.S. 362 (2000). An "unreasonable application" occurs when the state court's application of Supreme Court precedent to the facts of the case is "objectively unreasonable." Id. at 407-408, 411, 413. It is not sufficient for the federal court to conclude that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Id. at 411. Rather, "some increment of incorrectness beyond error" is required. Francis S. v. Stone, 221 F.3d 100, 111 (2nd Cir. 2000). This increment "need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Id.

Here, the state court's decision was an unreasonable application of the Supreme Court precedent as set forth in Chambers v. Mississippi, 410 U.S. 284, 294 (1973) and cases such as Davis v. Alaska, 415 U.S. 308, 316 (1974). The state appellate court held that:

> the trial court did not unconstitutionally preclude him from confronting his own witness with a prior inconsistent statements (*see Chambers v Mississippi*, 410 US 284, 297-298). The defendant's counsel repeatedly elicited from the witness the relevant portions of the prior statement on redirect examination. Because further questioning with regard to the statement on the second round of

35

redirect examination would have been repetitive, the
court had discretion to limit such questioning (*see
Delaware v. Van Arsdall*, 475 US 673, 679; *People v.
Melendez,* 55 NY3d 445, 451-452) .

Yet, on re-cross examination, counsel had elicited only was that Eldridge
told the police that petitioner was not with her during the murder and had
nothing to do with it or the robbery.  Counsel, however, also wanted to bring out
specific questions and answers in the statement regarding where petitioner  was
when, about what he knew, and about what he had not done.  Contrary to the
Appellate Division's determination, not only was this evidence relevant to the
jury's determination, but it was also not repetitive of the simple denials already
elicited.  Not only was the reasoning of the Appellate Division deeply flawed, but
its result was "erroneous by a significant increment beyond incorrectness."
Francis S. v. Stone, 221 F.3d at 111.

This Court should grant a writ of habeas corpus should be granted, and
petitioner should be released unless he is re-tried within 60 days.

POINT II

PETITIONER WAS DENIED HIS DUE PROCESS
RIGHT TO A FAIR TRIAL AND TO PRESENT A
DEFENSE WHEN THE TRIAL COURT (A)
PRECLUDED HIM FROM INTRODUCING
RELEVANT EVIDENCE CHALLENGING THE
RELIABILITY OF HIS STATEMENTS TO THE
POLICE AND (B) FAILED TO CHARGE, AS
REQUESTED, THAT THE JURY HAD TO
DETERMINE THE TRUTHFULNESS OF
PETITIONER'S CONFESSION. U.S. CONST.,
AMENDS. VI, XIV.

At trial, the People introduced into evidence a statement allegedly made by

petitioner, in which he admitted his involvement in the Camano and Canjura

robberies and in the felony-murder of Khaimov. Petitioner argued, however, that

the statement was both involuntary and untrue. His ability to present those

defenses, however, was undercut by the court's erroneous rulings that prevented

counsel from demonstrating a <u>Miranda</u> violation and from establishing a motive

for the false confession. The court further erred by failing to instruct the jury, as

requested, that the People had the burden of proving beyond a reasonable doubt

the truthfulness of any part of the statement upon which the jury relied. The

individual and cumulative impact of these errors deprived petitioner of a fair trial

and the right to present a defense. U.S. Const., Amends. VI, XIV.

(A)

Derived from the due process and confrontation clause of the federal

constitution, few rights are more fundamental than the right of an accused to

present a complete defense. U.S. Const., Amends. VI, XIV; <u>California</u> v.

<u>Trombetta</u>, 467 U.S. 479, 485 (1984). The right to present a defense

37

encompasses the right to a meaningful opportunity to challenge the credibility of a confession.   As the Supreme Court declared in <u>Crane</u> v. <u>Kentucky</u>, 476 U.S. 683 (1986):

> That opportunity would be an empty one if the state were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence.   In the absence of any valid state justification, exclusion of this exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'

Id. at 690-691, quoting <u>United States v. Cronic</u>, 466 U.S. 648, 656 (1984).

Here the trial court committed serious error by precluding evidence bearing on the reliability of petitioner's statement to the police.   The first, excluding evidence about petitioner's receipt and understanding of his <u>Miranda</u> rights, was relevant to the voluntariness of his statement, and the second, excluding petitioner's belief that Eldridge was pregnant, was relevant to petitioner's motive to falsely inculpate himself.

First, a criminal defendant may challenge the voluntariness of his statements, notwithstanding the denial of a pre-trial motion to suppress.   <u>See</u> <u>People</u> v. <u>Huntley</u>, 15 N.Y.2d 72 (1965); C.P.L. §§60.45, 710.70(3).   Such a claim may include the argument that the defendant's rights under <u>Miranda</u> v. <u>Arizona</u>, 384 U.S.436 (1966), had been violated, either based on the non-receipt of the warnings or the defendant's misunderstanding of them.   <u>People</u> v. <u>Graham</u>, 55 N.Y.2d 144 (1982).   A jury which finds that a statement has been made involuntarily may not  use it in reaching its verdict.   <u>Id</u>. at 150; C.P.L. §710.70(3).

Here, Detective Quinn testified that, prior to questioning petitioner, he read petitioner his Miranda rights and that petitioner understood and waived those rights.    In response, counsel wanted to introduce into evidence the videotape of the prosecutor's aborted interrogation of petitioner.    After the prosecutor advised petitioner of his rights and petitioner indicated that he understood his rights and was willing to speak, petitioner said " . . . can I get an attorney."  The prosecutor then ended the interrogation, finding that petitioner had invoked his right to counsel.

Counsel argued that the videotape was admissible to on the issue of whether petitioner had made a knowing and intelligent waiver of his Miranda rights prior to his statement to Detective Quinn.  The court precluded the evidence, holding that the videotape could not be relevant to petitioner's state of mind seven hours earlier at the first set of Miranda warnings.  The court also noted that the invocation of counsel was questionable.

Evidence is relevant when it tends to make the existence of any material fact more probable or less probable than it would be without the evidence. People v. Scarola, 71 N.Y.2d 769, 779 (1988); Fed.R.Evid. 401; Prince, Richardson on Evidence, §4-101 (11th Ed. Farrell).   If petitioner had invoked his right to counsel in the videotape, then the jury could have found that relevant to whether petitioner had been told of his rights earlier, whether he had understood those rights, or whether he had asserted them.  That there may be reasons, which the prosecutor could argue to the jury, that petitioner would have invoked counsel before a second statement and not before his first did not render the videotape

39

inadmissible.  Rather, the issue was a fact question for the jury to decide, and these factors went to the weight of the evidence, and not its admissibility.

Moreover, the videotape was very relevant even if, as the prosecutor argued, petitioner had not invoked his right to counsel.  If petitioner was unsure of or asking for clarification of his right to counsel during the videotape, then it surely reflected on whether he had ever previously been advised of his right, whether he had been properly advised that he had the right to counsel during interrogation, or whether, if he had been advised of his right, he had understood it at the time.

Contrary to the trial court's and Appellate Division's determination, the lapse of seven hours between the giving of the <u>Miranda</u> warnings before the first interrogation and the start of the second interrogation did not render the videotape of such little value that it was inadmissible.   Courts have consistently held that the lengthy intervals between the giving of <u>Miranda</u> warnings and the start of an interrogation will not render the resulting confession inadmissible. <u>See</u>, <u>e.g.</u>, <u>Stumes v. Solem</u>, 752 F.2d 317, 320 (8th Cir. 1985)(five hour interval between first and second interview did not invalidate suspect's waiver given before first interview); <u>Jarrell v. Balkcom</u>, 735 F.2d 1242, 1254 (11th Cir. 1984)(change in interrogators and three-hour lapse did not render confession inadmissible); <u>United States ex rel Henne v. Fike</u>, 565 F.2d 809, 814 (7th Cir. 1977)(nine hours between warnings and waiver not too long); <u>see</u> <u>also</u> <u>People v. Starks</u>, 139 A.D.2d 681 (2nd Dept. 1988)(9½-hour lapse between waiver and statement did not render it involuntary); <u>People v. Manley</u>, 40 A.D.2d 907 (3rd

Dept. 1972)("unreasonable to assume" that defendant had forgotten rights given to him at 2:00 p.m. when he signed confession at 10:30 p.m.).

Thus, in these cases, the passage of time did not render the giving of Miranda warnings irrelevant to the defendant's state of mind many hours later. Similarly, here also, petitioner's comments at his second interrogation were circumstantial evidence of his state of mind earlier and whether he understood the rights he was given. Thus, the lapse of seven hours went to the weight of the evidence, and not its admissibility. The court erred in precluding this defense evidence.

Second, a criminal defendant may also attack the truthfulness of a statement, and a jury may consider only those portions of the statement it finds to be true. People v. Vargas, 7 N.Y.2d 555, 562 (1960); People v. Bowen, 134 A.D.2d 356, 357 (2nd Dept. 1987). Here, as part of this defense, defense counsel asked Detective Quinn, who took petitioner's statement, if petitioner had told him that Eldridge was pregnant with petitioner's child (1434). The court erroneously sustained the government's objection to the question.

Petitioner's belief that Eldridge was pregnant was clearly relevant to show why he would falsely confess to the murder of Khaimov in order to protect her. Moreover, because it was admissible to show petitioner's state of mind, and not for its truth, it did not constitute inadmissible hearsay. United States v. Detrich, 865 F.2d 17, 21 (2nd Cir. 1988)(non-witness's statement to DEA agent was circumstantial evidence of defendant's statement of mind, was not offered for truth, and was not hearsay); United States v. Kohan, 806 F.2d 18, 21-22 (2nd Cir.

1986)(evidence of what co-defendant told defendant about stolen checks was not offered for truth but was circumstantial evidence of defendant's state of mind); see also People v. Perez, 9 A.D.3d 376 (2nd Dept. 2004)(evidence that non-testifying witness implicated defendant in murder was admitted not for truth but to explain why defendant confessed when he did); People v Boyd, 256 A.D.2d 350 (2nd Dept. 1998)(defendant charged with possession of stolen property should have been able to testify to conversation with seller to establish defendant's state of mind).

That counsel elicited from Eldridge that in June she told petitioner that she was pregnant (1698) did not cure the error.  The prosecutor vehemently argued that Eldridge would say anything to help petitioner.  On the other hand, Detective Quinn was a witness for the prosecution, who had no motive to assist the defense case.  Moreover, that petitioner commented on Eldridge's pregnancy while at the precinct strongly reflected his state of mind at the time he confessed.  Thus Quinn's testimony would have had greater probative value.  See United States v. Detrich, 865 F.2d at 21-22 (given defendant's credibility may have been much reduced, error in precluding DEA agent from testifying to third-party statement was not harmless even though defendant testified to overhearing DEA repeat statement); United States v. Kohan, 806 F.2d at 22 (that government had elicited substance of precluded conversation did not render error harmless, given defense witness's testimony was less self-serving and had greater probative value).  Thus, the court's preclusion of this testimony, adversely impacting on the

presentation of the defense case, was error.[12]

(B)

The only direct evidence the People offered to link petitioner to the murder of Yuri Khaimov was his statement to the police. Defense counsel, relying on his cross-examination of the People's witnesses and Tami Eldridge's evidence, argued that the confession was false. Accordingly, counsel requested that the jury be charged that the People had the burden of proving beyond a reasonable doubt the truthfulness of any part of the statement upon which the jury relied. The court's failure to give the charge unfairly undermined the defense case and deprived petitioner of a fair trial.

The central purpose of a criminal trial is to decide the factual question of a defendant's guilt or innocence. Arizona v. Fulminante, 499 U.S. 279, 308 (1991). An improper jury instruction can compromise the determination of this question, and a writ of *habeas corpus* will issue if it is established "not merely that the instruction is undesirable, erroneous or even universally condemned, but that it violates some right which was guaranteed to the defendant by the Fourteenth Amendment." Cupp v. Naughten, 414 U.S. 141, 146 (1973).

The question is whether, viewing the charge as a whole, the omitted instructions "so infected the entire trial that the resulting conviction violated due process." Id. at 147; accord Henderson v. Kibbe, 431 U.S. 145, 154 (1977); Blazic v.

---

[12] Similarly, the court erred in precluding defense counsel from eliciting from Eldridge whether her relatives in New York has given her money. The government had already elicited from their witnesses that Eldridge and petitioner needed money to pay their bills, and the only purpose of this testimony was to establish motive. Thus, the defense had the right to counter this evidence with testimony regarding a lack of motive.

43

Henderson, 900 F.2d 534, 543 (2nd Cir. 1990). Although this "burden is undeniably heavy," Henderson v. Kibbe, 431 U.S. at 155, it does not mean that an omitted jury instruction may never rise to such proportions. See, e.g., Harris v. Alexander, 548 F.3d 200 (2nd Cir. 2008)(burden satisfied where court failed to deliver charge on agency defense); Davis v. Strack, 270 F.2d 111 (2nd Cir. 2001)(burden satisfied where court failed to deliver self-defense instruction). Here, viewing the charge as a whole, the court's failure to instruct the jury that it had to find, beyond a reasonable doubt, that any portion of petitioner's confession upon which they relied was truthful, severely impacted adversely on the defense case and deprived petitioner of his due process right to a fair trial.

In charging the jury, the court must state "the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts." N.Y.C.P.L. §300.10(2). When, as here, the People rely upon a defendant's pre-trial statement, the jury must evaluate the statement for truthfulness and must find that the People have proven beyond a reasonable doubt the truthfulness of any portion of the statement upon which it relies in reaching its verdict. People v. Vargas, 7 N.Y.2d 555, 562 (1960); see People v. Rivera, 186 A.D.2d 765 (2nd Dept. 1992); People v. Bowen, 134 A.D.2d 356, 357 (2nd Dept. 1987).

Here, a crucial part of the defense case was that petitioner's precinct statement was false and that he had confessed in order to protect Eldridge, who was his girlfriend and the mother of two small daughters, and who had been just been arrested with the stolen car and the gun used to shoot Khaimov. To that

44

end, the defense showed that the facts in the confession were false, arguing that it was Eldridge who had shot Khaimov and that petitioner's version of the shooting was contradicted by the medical examiner's testimony. The defense also argued that the confession to the Canjura and Camano robberies were false, pointing out that its details were inconsistent with the complainants' testimony. However, the court failed to give the requested charge, and thus the jury was never informed that it was their duty to assess the truthfulness of the statement, that the burden was on the government to prove the truthfulness of the statement, and that the standard of proof was beyond a reasonable doubt.

Nothing in the charge cured these fundamental deficiencies. The court's only instructions on determining truthfulness were made with specific reference to the "testimony of witnesses" and to witnesses (2209-2214). Petitioner's statement was not testimony, and he was not a witness. Hence, the jury could not have understood the court's instructions regarding the evaluation of credibility to apply petitioner's pre-trial statements.

Although the Appellate Division stated that the court "specifically instructed the jury to apply the test of believability and accuracy to the confession that the court had described for evaluating the truthfulness of witnesses," the charge was simply not that broad. The trial court told the jury that "in determining whether the statement was made," it could apply the test for believability and accuracy that had been previously discussed (2221). In other words, the jury had to assess the credibility and accuracy of Detective Quinn, who was the only witness who testified that petitioner had, in fact, made the

45

statement. The charge said nothing about assessing the truthfulness of the statement itself.

Moreover, the court's instructions actually would have led the jury to believe that there was no truthfulness issue. The court charged the jury that it had to determine whether the statement had been made and whether it was voluntary. Once those factual issues were resolved, the court charged, it was then up to the jury to give the statement whatever weight it saw fit, in other words, how much it contributed to the finding of guilt.[13] Thus the court's charge was not only incomplete by failing to instruct the jury to assess the truthfulness of petitioner's statement and on the government's burden, but it was also misleading.

Finally, the Appellate Division held that this issue was unpreserved for its review. It stated that

> The defendant's contention that the trial court erred in instructing the jury that his confession should be considered as evidence if the statement was found to have been voluntarily made, without also instructing the jury that it must also consider the truthfulness of the statement is unpreserved for appellate review (*see* CPL 470.05[2]). Although the defendant requested a voluntariness charge which included an instruction on the jury's evaluation of the truthfulness of the statement, the defendant did not object to the voluntariness charge prepared by the court in

---

[13]    The court informed the jury that, before they could consider the statement, it "must first be convinced beyond a reasonable doubt that the defendant made the statement, and that the defendant did so voluntarily" (2221) and that if it found beyond a reasonable doubt that the statement was voluntarily made, it could "consider that statement in your determination of whether or not the defendant is guilty of the crimes charged as related to June 12, 1999, and June 16, 1999" (2223).

46

> respondent to the defendant's request (*see People v. Whalen*, 59 NY2d 273, 280).

The court's statement, however, does not act of a procedural bar to this Court's review of the issue.   A procedural bar must rest on a ground "adequate" to support the judgment, and it must be "firmly established and regularly followed in the specific circumstances presented in the case." Herbert v. Cotto, 331 F.3d 217, 240 (2nd Cir. 2003).

In Whalen, the Court of Appeals held that, when a judge grants a defendant's request to charge  and then delivers a different version of the charge, defense counsel has an obligation to then object. People v. Whalen, 59 NY2d 273, 280 (1983). This, however, was not a Whalen-type case.   In the trial court, defense counsel did not request a truthfulness charge as part of a voluntariness charge; nor are the two concepts inextricably linked.   He simply requested that the court charge on both concepts.   Thus, the issue was preserved under People v. Leisner, 73 N.Y.2d 140 (1989), where the Court of Appeals held that where a defendant requests a charge and neither that charge nor its equivalent was given the jury, the defendant has no further duty to preserve their claim.   Consequently, the Appellate Division's decision does not operate as a procedural bar.

To the extent that the issue is unpreserved, counsel provided petitioner with the ineffective assistance of counsel.   To establish that he was convicted in violation of his right to effective assistance of counsel, a claimant must show that counsel's performance fell below "an objective standard of reasonableness" and demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." Strickland v.

47

Washington, 466 U.S. 668, 687-688, 694 (1984); accord Mason v. Scully, 16 F.3d 38, 42 (2nd Cir. 1994). Even "a single serious error" can constitute ineffective assistance of counsel. Kimmelman v. Morrison, 477 U.S. 365, 383 (1986).

Here, the government's only direct evidence against petitioner on the felony-murder charge was his confession, and the core of the defense was to argue that the confession was false in its entirety. To that end, the defense called Eldridge to the stand and requested that the court charge the jury on assessing the truthfulness of petitioner's statements. When that charge was not given to the jury, it was ineffective for counsel to not again request the charge. See, e.g., Reagan v. Norris, 365 F.3d 616, 621-622 (8th Cir. 2004)(counsel ineffective for failing to object to jury instruction which omitted essential element of offense). Without the charge, the jury did not know that the burden was on the government to prove the truth of the statement (and not on petitioner to prove its falsity) or that it was a high burden of proof beyond a reasonable doubt. Thus, petitioner was prejudiced by counsel's inaction.[14]

*       *       *

Here, the state court's decision was an unreasonable application of the Supreme Court precedent as set forth in Cupp v. Naughten, 414 U.S. 141 (1973) and Crane v. Kentucky, 476 U.S. 683 (1986). For the reasons discussed above – relying on the time lapse in upholding the preclusion of the videotape, upholding the preclusion of questions regarding pregnancy and money as without merit,

---

[14]     In assessing counsel's ineffectiveness, the Court should also consider the argument on page 55 and Point V.

Counsel's ineffectiveness also constituted cause, and prejudice has been shown. Coleman v. Thompson, 501 U.S. 722 (1991).

and determining that the remainder of the charge cured the omission of an instruction on truthfulness, the Appellate Division's decision was "objectively unreasonable." Moreover, its result was "erroneous by a significant increment beyond incorrectness." Francis S. v. Stone, 221 F.3d at 111. Consequently, a writ of habeas corpus should be granted, and petitioner should be released unless he is re-tried within 60 days.

<u>POINT III</u>

THE EVIDENCE WAS LEGALLY INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT PETITIONER WAS GUILTY OF THE STEWART ROBBERY WHERE IT CONSISTED SOLELY ON THE TESTIMONY OF THE COMPLAINING WITNESS, WHOSE OPPORTUNITY TO VIEW THE ROBBER WAS LIMITED AND WHOSE DESCRIPTION OF THE ROBBER DID NOT MATCH PETITIONER'S HEIGHT, ETHNICITY, AGE, AND FACIAL CHARACTERISTICS. U.S. CONST. AMEND. XIV.

As the Supreme Court has recognized, jurors occasionally reach irrational results. Jackson v. Virginia, 443 U.S. 307 (1979). That is what happened here. Petitioner's conviction for the June 10th robbery rested exclusively on the uncorroborated identification of a single eyewitness, Karlene Stewart. Yet, her ability to observe and retain an image of the perpetrator during the robbery was extremely limited, and her description of the perpetrator was inconsistent with petitioner's height, ethnicity, age, and facial characteristics. Thus, the evidence was legally insufficient to prove petitioner's guilt beyond a reasonable doubt, and his conviction violates due process. U.S. Const., Amend. XIV.

Due process protects a defendant in a criminal case against conviction

except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime charged. In re Winship, 397 U.S. 358, 364 (1970). In Jackson v. Virginia, the Supreme Court squarely held that a federal court must grant habeas corpus relief "if it is found that upon the record evidence adduced at trial no rational trier of fact could have found proof beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. at 319; accord Dixon v. Miller, 293 F.3d 74, 81 (2nd Cir. 2002). Because the government receives the benefit of having all permissible inferences drawn in its favor, the defendant "bears a heavy burden." Dixon v. Miller, 293 F.3d at 81. The court, however, must still be satisfied that the inferences are sufficiently supported to permit a rational jury to find the elements beyond a reasonable doubt. Id.

Here, the government's proof failed to establish, beyond a reasonable doubt, that petitioner had committed the Stewart robbery. In determining the reliability of any identification, the three most crucial factors are the eyewitness's opportunity to observe the perpetrator, the degree of attention paid, and the accuracy of the description given. Manson v. Braithwaite, 432 U.S. 98, 114 (1977); Neil v. Biggers, 409 U.S. 188, 199-200 (1972); United States v. Marchand, 564 F.2d 983, 995-996 (2nd Cir. 1977).

During the robbery itself, Stewart's opportunity to view the perpetrator was extremely limited. The man approached Stewart from the rear, and she first became aware of him only when he placed a gun to the back of her head. The robbery consisted solely of the man's twice demanding her purse, her refusal, and the man's grabbing the purse and fleeing. As Stewart admitted, the incident

happened "really fast."  The suddenness and brevity of the robbery severely circumscribed Stewart's opportunity to observe.

Moreover, the degree of attention Stewart paid to the robber's features was questionable.  The robbery started with a gun to the back of Stewart's head which remained there throughout the incident.  It is well-recognized that the use of a weapon causes a witness to focus on the weapon itself, rather than on the face of the person pointing it.  See, e.g., Loftus & Doyle, Eyewitness Testimony: Civil and Criminal §2.10 (2nd ed. 1992); Raheem v. Kelly, 257 F.3d 122, 138 (2nd Cir. 2001).  This, by necessity, drew her attention away from the robber's features.  Indeed, Stewart never testified that she looked at the face of the robber during the incident.  Moreover, stress also has been recognized as an impediment to reliable identification.  See United States v. Russell, 532 F.2d 1063, 1066 (6th Cir. 1976); People v. Morales, 37 N.Y.2d 262, 271 (1975); see also Fishman & Loftus, "Expert Psychological Testimony on Eyewitness Identification," 4 Law & Psychology Review 87, 92-93 (1978).  Armed robbery is one of the most stressful encounters one can experience.  It is likely that the stress of the incident impeded the ability of Stewart, who admittedly was frightened, to perceive and retain information about the perpetrator's features and to make a reliable identification.

Thus, Stewart's opportunity to form and retain an accurate mental picture of the robber was impaired by the short duration of the robbery and the surrounding circumstances.  Although Stewart claimed that she saw the perpetrator prior to the robbery, her inconsistent statements regarding this viewing cast doubt on what actually occurred.  In her statement to the police,

Stewart said that she had seen the robber on the subway platform and that he had followed her up the stairs, remained outside the bodega, and then followed her home.  In sharp contrast, at trial, Stewart claimed that she first saw the man in the bodega, where he stared at her and she watched him carefully, and that he remained in the store for seven to ten minutes.

Finally, Stewart's description of the perpetrator did not match petitioner's height, weight, ethnicity, age, or facial characteristics.  Stewart stated that the robber had no unusual facial features and had a goatee.  Yet, petitioner had a noticeable anomaly in his left eyebrow, namely several slashes through it; this anomaly was evident in his Louisiana identification picture taken March 23, 1999, and in his arrest photograph of June 17, 1999.  And, according to Detective Woods, petitioner had no facial hair.

Similarly, while Stewart described the robber's hair as short, petitioner's photographs show that petitioner basically had a shaved head.  Moreover, given petitioner's hairstyle and high forehead, Stewart would not have been able to see any hair from under the hood.  Of course, the hood would have also prevented a "comprehensive view of the face, it obscured his ears, his hairline and the shape of his head." Solomon v. Smith, 645 F.2d 1179, 1186 (2nd Cir. 1981).

Moreover, Stewart told the police that the robber was an Hispanic and spoke with a Hispanic accent.  Petitioner was black, and none of the police officers who spoke with him mentioned an Hispanic accent.

Stewart also told the police that the perpetrator was 5'5;" at trial, four years later, she said 5'6".  Yet, according to his pedigree information, petitioner

was 5'9". Not only is a discrepancy of three to four inches significant, but in comparative terms, its importance substantially increases: Stewart, who was 5'8," testified that the robber was standing right next to her and was a couple of inches shorter than she was; petitioner, however, is taller than Stewart.

Similarly, Stewart, who was 28 years old, said that the robber was two years younger; petitioner at the time of the incident was 19 years old. A 28-year-old is not likely to confuse a 19-year-old with a 26-year-old.

That Stewart identified petitioner as the robber in the line-up and at trial does not establish the reliability of the identification beyond a reasonable doubt. Her identification at the line-up came 11 days after the incident, in a line-up where petitioner, with the lightest skin and wearing a bright red tee shirt, stood out. Notably, in the line-up, petitioner's eyebrow slashes were not visible, covered by the hat provided.

Furthermore, the in-court identification was of little probative value. Almost four years had passed since the incident, casting significant doubt on Stewart's ability to retain the image of the robber. See People v. Davino, 288 N.Y. 423, 427 (1942)(accurate identification seven months later is difficult to make); see also Handberg, "Expert Testimony on Eyewitness Identification: A New Pair of Glasses for the Jury," 32 Am. Crim. L.Rev. 1013, 1020 (1995). The circumstances surrounding the in-court identification were also highly suggestive, given the traditional courtroom setting of the defendant sitting at the defense table, see United States v. Archibald, 734 F.2d 938, 941 (2nd Cir. 1984)(a circumstance obviously suggestive to a witness asked to make in-court

identifications).

Finally, the government offered no evidence to corroborate Stewart's identification of petitioner, except the innocuous fact that he lived 12 blocks from the robbery location, and even further from the subway stop and bodega. Although the police claimed that he admitted to other robberies and murder, petitioner made no statements regarding the Stewart incident. The People did not bring in the owner of the bodega to confirm either Stewart's identification or what had occurred in the bodega. The People did not ask Stewart to identify the weapon recovered from Eldridge. The police, who searched petitioner's motel room, did not recover either a black hooded sweatshirt or black sweatpants, as Stewart described, nor was petitioner wearing such clothes when arrested. Thus, where Stewart's identification of petitioner could have been confirmed, it was not, and petitioner's conviction rested solely on her problematic testimony.

Given the evidence in this case, no rational juror could have determined that it sufficed to prove petitioner's identity as the robber beyond a reasonable doubt. The Appellate Division's decision to the contrary was not only an unreasonable application of Jackson v. Virginia, 443 U.S. 307 (1979), but also is "erroneous by a significant increment beyond incorrectness." Francis S. v. Stone, 221 F.3d at 111.

The Appellate Division also determined that the issue was unpreserved for review, citing N.Y.C.P.L. 470.05(2) and People v. Gray, 86 N.Y.2d 10, 19 (1995). This, however, does not act of a procedural bar to this Court's review of the issue. A procedural bar must rest on a ground "adequate" to support the judgment, and

54

it must be "firmly established and regularly followed in the specific circumstances presented in the case." <u>Herbert v. Cotto</u>, 331 F.3d 217, 240 (2nd Cir. 2003).

In <u>Gray</u>, contending that the state had failed to prove one of the elements of the charged crimes, the defendants argued that either no preservation was required or that a general motion to dismiss at the end of the People's case was sufficient. The Court of Appeals rejected those arguments, holding that it was necessary to argue with specificity which element had not been proven. Here, at the end of the state's case, defense counsel moved for a trial order of dismissal and specifically argued that the state had not proved petitioner's identity as the Stewart robber. Thus, the ruling in <u>Gray</u> is not applied to the circumstances presented here.

To the extent that the issue is unpreserved, counsel provided petitioner with the ineffective assistance of counsel (<u>see</u> page 48, <u>supra</u>).[15] Moreover, this Court should review the issue as failure to consider the claim will result in a "fundamental miscarriage of justice." <u>Coleman v. Thompson</u>, 501 U.S. 722, 750 (1991); <u>accord</u> <u>Dixon v. Miller</u>, 293 F.3d at 79-81.

---

[15]    Counsel's ineffectiveness also constituted cause, and prejudice has been shown. <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991).

PETITIONER WAS DENIED HIS STATE AND FEDERAL DUE PROCESS RIGHTS TO A FAIR TRIAL AND TO FAIR NOTICE OF THE CHARGES AGAINST HIM UNDER THE SIXTH AND FOURTEENTH AMENDMENTS OF THE CONSTITUTION WHEN THE PEOPLE CHANGED THEIR THEORY MID-TRIAL FROM PETITIONER BEING THE PRINCIPAL PARTICIPANT TO THEN BECOMING AN ACCOMPLICE. U.S. CONST. AMEND. VI, XIV; N.Y. CONST. ART. I § 6.

The testimony and evidence presented to the Grand Jury, as well as the facts outlined during opening statements, supported the People's theory that petitioner acted alone and was the principal participant in this robbery/murder charge. The People alleged that petitioner was the person that actually fired the shots that killed Yuri Khaimov during the course of a robbery. This theory was presented by the People with the full knowledge that another person had already pled guilty to this same crime prior to petitioner's trial. The People were also aware that the Court had accepted this person's allocution as being the principal participant who actually shot the victim.

Several months prior to the commencement of petitioner's trial Tami Eldridge (petitioner's girlfriend at the time) pled guilty to murdering the victim, Yuri Khaimov. Part of her plea agreement was that she had to implicate petitioner and state that he was present when she committed this crime. This was inconsistent with an earlier statement she had made when she initially confessed to the crime. In exchange for her plea, Tami Eldridge was promised the lowest sentence allowable by law which was 15 years to life. This sentence was to run concurrent with a five year sentence she was

already serving. This accepted plea, which the People were aware of, clearly highlighted the fact that petitioner could not have been the sole perpetrator as he was charged in his indictment. The Bill of Particulars in petitioner's case also included the same information which indicated that petitioner acted alone and was the principal in this crime.

### A. Petitioner Was Denied His Statutory Right To Fair Notice Of His Alleged Crime.

New York State's constitution provides a defendant with a right to indictment by a grand jury and notice of the charges against him: "No person shall be held to answer for a capitol or otherwise infamous crime ... unless on indictment of a Grand Jury ..." New York Const. Art. I § 6. In addition a defendant has a separate constitutional right to "be informed of the nature and cause of the accusation."

Under New York law the indictment serves at least three constitutional purposes. First, it provides a defendant with fair notice of the accusation that have been made against him to prepare a defense. People v. Miles, 64 N.Y.2d 731 (1984). Second, the indictment indicates just which crimes the defendant has been tried for, in order to avoid subsequent attempts to retry him for the same crimes in violation of constitutional protections against double jeopardy. Third, the indictment provides "some means of ensuring that the crime for which the defendant is brought to trial is in fact one for which he was indicted by the Grand Jury, rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence." People v. Iannone, 45

N.Y.2d 589 (N.Y. 1978).

Among several other charges, petitioner was indicted by a Grand Jury on three counts of Murder in the Second Degree for a single act. All of the allegations were presented under the pretense that petitioner, acting alone, caused the death of Yuri Khaimov during the course of a robbery. The Grand Jury heard no testimony or saw no evidence which indicated that there was an accomplice involved in this crime. They relied on the People's theory that petitioner was the sole participant in this act and that during the course of a robbery, he caused the death of Yuri Khaimov by shooting him with a deadly weapon.

Based on this information, the Grand Jury passed upon these terms of petitioner being the sole participant in this accusation and voted to indict him as being the actual shooter and causing the death of the victim. As such, petitioner was committed to prepare his defense according to the People's theory presented to the Grand Jury. This theory was also supported by the information included in the bill of particulars which was prepared by the People. This same theory was presented to the trial jury during opening statements by the People and petitioner prepared his defense according to their theory that he was the principal participant in this accusation.

The Sixth Amendment provides, in pertinent part, that "[i]n all prosecutions, the accused shall enjoy the right...to be informed of the nature and cause of the

accusation." U.S. Const. Amend. VI. The Sixth Amendment right of the accused to reasonable notice of the charges against him is made applicable to the states by the Fourteenth Amendment and may not be abridged. Moldwoff v. Cunningham, 432 F.Supp. 814, 817 (S.D.N.Y. 1977)('As the Supreme Court has recently stated because the rights guaranteed to criminal defendants through the Sixth Amendment, including the right "to be informed of the nature and cause of the accusation" ... are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in criminal courts of the States.)" See, Faretta v. California, 422 U.S. 806, 818 (1975); see also, Gannett Co. v. DePasquale, 443 U.S. 368, 379 (1979); Jelinek v. Costello, 247 F.Supp.2d 212 (E.D.N.Y. 2003). Petitioner was ultimately prejudiced by being tried and convicted on information that was never considered by the Grand Jury that voted to indict him. Petitioner was convicted on an entirely different element for which he never received notice of in violation of his due process rights under the Constitution. Had petitioner received fair notice that the People intended to pursue an alternative theory of accomplice liability he would have strategized differently. There are a myriad of viable alternatives that may have been considered had timely notice been given. See, Russell v. United States, 369 U.S. 749 (1962).

Thus, for the prejudicial violations outlined herein,

petitioner's case strongly suggest his entitlement to habeas relief.

**B.    The People's Change Of Theory Mid-Trial Prejudiced Petitioner.**

There is an unconstitutional variance in violation of the New York Constitution when the State's proof at trial contradicts the elements described in the indictment and bill of particulars. People v. Grega, 72 N.Y.2d 489 (1988). The Grega court explained that "Proof at trial that varies from the indictment potentially compromises two of the functions of the indictment-notice to the accused and the exclusive power of the Grand Jury to determine the charges. Where defendant's right to fair notice of the charges or his right to have those charges preferred by the Grand Jury rather than by the prosecutor at trial has been violated, reversal is required." Id. at 496.

Had the Grand Jury been given the facts surrounding the People's newfound theory, they may very well have not indicted petitioner for murder count at all. Although extraneous or immaterial facts in an indictment need not be proved by the State in order to sustain a conviction, when the indictment specifies a set of facts supporting a material element of the crime charged, the People at trial are not at liberty to present evidence that affirmatively disproves it. Grega at 497. Having specified in the indictment that petitioner (acting alone) shot the victim, causing his death, the People were not then free to present proof at trial that virtually ruled out that theory of being the principal and

substituted it with another. <u>People v. Shealy</u>, 51 N.Y.2d 933;
<u>People v. Barnes</u>, 50 N.Y.2d 375, 379; N.Y. Const. Amend. Art.
I § 6. The Supreme Court has "repeatedly held that state
statutes may create liberty interest that are entitled to the
procedural protection of the Due Process Clause of the
Fourteenth Amendment." <u>Vitek v. Jones</u>, 445 U.S. 480 (1980).
Such state-created rights may not be "arbitrarily abrogated."
<u>Wolff v. McDonnell</u>, 418 U.S. 539, 557 (1974); see also,
<u>Saldana v. New York</u>, 665 F.Supp. 271, 275 (S.D.N.Y.
1987)(once a state creates a right for a defendant to testify
before a Grand Jury, "it cannot cause that right to be
forfeited in a manner which is arbitrary or fundamentally
unfair.")

Where a State has provided for the imposition of criminal
punishment in the discretion of the trial jury, it is not
correct to say that the defendants interest in the exercise
of that discretion is merely a matter of state procedural
law. A defendant in such a case has a substantial and
legitimate expectation that he will be deprived of his
liberty only to the extent determined by the jury in the
exercise of it's statutory discretion, and that liberty
interest is one that the Fourteenth Amendment preserves
against arbitrary deprivation by the State. <u>See</u>, <u>Hicks v.</u>
<u>Oklahoma</u>, 447 U.S. 343, 346 (1980).

The same reasoning applies with full force to the
deprivation of a defendant's state-created right to
indictment by a Grand Jury. <u>See</u>, <u>Jones v. Keane</u>, 2002 U.S.

Dist. LEXIS 25278, at 31-32 (W.D.N.Y. 2002)(right to a grand jury indictment under N.Y. Constitution cannot be forfeited in an unfair or arbitrary manner and must conform with the Due Process Clause of the Fourteenth Amendment). A violation of petitioner's constitutional Due Process rights unquestionably occurred when the People changed their theory mid-trial to him now an "accomplice" to the crime he on trial for. This new theory only became adopted after a witness, Tami Eldridge, testified at petitioner's trial that she in fact had pled guilty to this crime and that she was the principal participant that actually shot and killed the victim.

While the People did, at one point, proffer a theory of accomplice liability against petitioner, this occurred only after petitioner called codefendant (Tami Eldridge) to the witness stand to confirm her role as the principal. The People's alternative theory, advanced after their case had ended, did little to cure the prejudice that resulted from the jury's exposure to a theory of liability previously determined in petitioner's favor through codefendant's valid and accepted allocution of guilt.

It is settled law that "where a provision of the Constitution forbids a conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground." Griffin v. U.S., 502 U.S. 46, 53 (1991). Accordingly, because the hypothesis of principal liability was relied upon by the People to convict

codefendant, it could not suffice as an accessible theory of
culpability against petitioner. Consequently, the general
verdict rendered in this case cannot stand and habeas relief
should be granted. See, Stromberg v. California, 283 U.S. 359
(1931).

C.  **The People Failed To Properly Amend The Information
    In The Indictment To Support The Accomplice Theory.**

New York Criminal Procedure Law §200.70 permits the
prosecution to seek to amend an indictment at any point
before or during trial, with the defense being permitted to
be heard. However, an indictment may not be amended to cure
the failure to state an offense, legal insufficiency of the
factual allegations, or misjoinder. C.P.L. §200.70(2). Nor
may the amendment change the theory of the grand jury.

An amendment may not change the prosecution's theory as
reflected in the evidence presented to the grand jury, or
otherwise tend to prejudice the defendant on the merits.
C.P.L. §200.70(2). Since the People were fully aware of this
statute, as they were aware of Tami Eldridge's plea, the
proper action was to move for a superceding indictment
charging petitioner with the accomplice liability theory in
accordance with C.P.L. §200.80 before the commencement of
trial. Instead, they failed to do this and unlawfully pursued
the accomplice liability theory against petitioner only after
the defense called Tami Eldridge as a witness and she
admitted to the shooting death of Yuri Khaimov. Counsel's
objections to this change was overruled and the People were
allowed to proceed with this theory although it was error.

In _Bradshaw v. Stumpf_, 125 S.Ct. 2398 (2005), the question presented was whether the prosecutor's use of "two conflicting theories concerning the identity of the shooter to convict both defendant, and ... his accomplice," rendered the proceedings constitutionally infirm in violation of due process. _Id._ at 2407-08. The Supreme Court in _Bradshaw_ held that a prosecutor who advances two materially inconsistent theories of guilt, on the part of two codefendants, violates the due process rights of both.

The dispositive question here is whether the shooter's identity was material to the felony murder count. Petitioner submits that it was because his accountability as an accomplice would have carried a different burden. If the jury determined that defendant was the shooter, it would have inevitably determined that he was guilty of felony murder because the evidence overwhelmingly indicates that the victim was killed in furtherance of a robbery. However, this liability is not necessarily attributable to an accomplice who assists in the larceny only "after" the fact. There are codified affirmative defenses to felony murder reserved exclusively for defendant's charged as accomplices. _See_, C.P.L. §125.25(3)[a][b][c] and [d]. By advancing a theory of principal liability the People restricted the availability of a viable affirmative defense.

Petitioner contends that the evidence at trial which rebutted the People's theory was now being adopted and pursued as the new theory of accomplice liability which

varied from the theory charged in the indictment and a amplified by the bill of particulars. By allowing the People to proceed with the accomplice liability theory only after Ms. Eldridge testified prejudiced petitioner's defense. The court erred in allowing this somewhat amendment as it was not directed at correcting a defect or error relating to a matter of form. People v. Gannett, 51 N.Y.2d 991; People Grega, 72 N.Y.2d 489. This somewhat constructive amendment also violated petitioner's due process rights since the People's theory was now completely changed. Neither the prosecutor nor the Judge should change the theory as framed in an indictment and bill of particulars. People v. Termotto, 155 A.D.2d 965 (4th Dep't. 1989); see also, People v. McFarland, 181 A.D.2d 1007 (4th Dep't. 1992); N.Y. Const. Art. I § 6.

Petitioner's defense relied on proving that he was not guilty as charged in the indictment. To support this he called Tami Eldridge to testify about her role in the crime. Ms. Eldridge testified that petitioner did not know about her having a gun, or about her plans to steal a car (Tr. 1781, 1784); that she directed petitioner to get into the car (Tr. 1786, 1787). She testified to having driven around with the deceased for some time because she had decided what she should do with him. (Tr. 1788, 1790-91). She testified that she became annoyed with Mr. Khaimov's crying so she pressed the gun to his temple and shot him. (Tr. 1792, 1803, 1804); and finally, that she shot him again because he was still alive (Tr. 1795, 1796).

The troubling aspect of this case is that Ms. Eldridge's testimony was not new to the People. They were fully aware of her guilty plea well before petitioner's trial commenced and still did not properly move for a superceding indictment that would support an accomplice liability theory. Instead, they proceeded to trial with their theory of petitioner being the principal participant in violation of his due process rights to fair notice of the charges against him and forced him to call Ms. Eldridge knowing that they would use her testimony to their advantage. This is a Due Process violation that should be reviewed by this court.

Federal habeas corpus relief does not lie for mere errors of state law. Estelle v. McGuire, 502 U.S. 62, 68 (1991). Nonetheless, the Due Process Clause requires that state courts conducting criminal trials "proceed consistently with 'that fundamental fairness' which is 'essential to the very concept of justice.'" Dunnigan v. Keane, 137 F.3d 117 (2d Cir. 1998)(quoting Lisenba v. California, 314 U.S. 219, 236 (1941)).

Errors of state law that rise to the level of a constitutional violation may be corrected by a habeas court, but even an error of constitutional dimension will merit habeas relief only if it had a 'substantial and injurious effect or influence in determining the jury's verdict'" Brecht v. Abrahamson, 507 U.S. 619, 623 (1993). Petitioner's claims rise to this level and habeas corpus relief should be granted.

## PETITIONER WAS DENIED HIS CONSTITUTIONAL SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

A criminal defendant has both a Federal and State Constitutional right to the effective assistance of counsel during his criminal proceedings. U.S. Const. Amend. VI; N.Y. Const. Art. I § 6; People v. Medina, 4 N.Y.2d 199, 207 (1978); McMann v. Richardson, 397 U.S. 759, 771 n. 14 (1970). A 'single" mistake by counsel, sufficiently egregious and prejudicial, notwithstanding adequate performance throughout the balance of the representation, warrants a finding of incompetency sufficient to make out a constitutional deprivation of ineffectiveness. Murray v. Carrier, 471 U.S. 478, 496 (1986); Kimmelman v. Morrison, 477 U.S. 365, 383 (1986); People v. Hobot, 84 N.Y.2d 1021, 1022 (1995); People v. Jenkins, 68 N.Y.2d 896, 898 (1986).

The New York Constitution requires a somewhat different test for ineffective assistance of counsel, requiring that the defendant demonstrate that he has been deprived of "meaningful representation", which does not require satisfaction of the Strickland prejudice prong. See, People v. Turner, 5 N.Y.3d 476 (2005); People v. Baldi, 54 N.Y.2d 137 (1981); People v. Claudio, 83 N.Y.2d 76, 79 (1983).

Petitioner submits that in deciding whether or not meaningful representation was afforded a defendant during trial the high court has declared that such analysis should not be made from the perspective of hindsight. People v. Satterfield, 66 N.Y.2d 796 (Ct. App. 1985). In the instant

case however, it is the trial judge's referral to defense counsel having neglected to object or properly preserve certain issues raised in post verdict C.P.L. §330.30 motion, or not having raised issues at all during trial that does give rise to the question of effective assistance. The trial court made the following observations in its denial of defense counsel's motion:

Denial of C.P.L. 330.30 Motion (12/1/03

P.6  "defendant made no request to charge jury..."

P.11 "defendant did not raise accomplice issue at trial... claim is not preserved..."

P.12 "Severance request by prior counsel not renewed by trial attorney."

P.14 "Defendant's want to testify was not raised or considered for severance purposes as it was not raised at trial."

P.16 The Court makes clear that counsel did not seek to revisit issue over video tape of defendant in police custody requesting counsel. Motion Judge Hanophy who ruled on motion left open the possibility that the ruling could be revisited if the video became relevant in light of cross examination or other evidence being presented.

Petitioner contends that since trial counsel had replaced prior counsel who handled all pretrial proceedings, he was required as part of his professional responsibility to familiarize himself with all hearings and rulings made, motions filed, and with existing and current law in order to effectively represent him. Developing the record to preserve for review is an essential part of that effectiveness. People v. Van Wie, 238 A.D.2d 876, 877 (4th Dep't. 1977). Statutory law also makes this position quite clear that in order to

68

preserve for review, error must be addressed during trial. McKinney's C.P.L. §470.05 states that "A general objection will not suffice to present specific complaint, and must be directed at the error to preserve a question of law as to the error."

The Supreme Court has recognized that counsel's paramount function "is to make the adversarial testing process work in [a] particular case." Strickland v. Washington, 466 U.S. 668, 686. The respondent's brief points out, "a specific objection assures "the trial court an opportunity to cure [a] purported error" at a time when remedial effort would be most convenient to all parties. Given the significance of the cited errors, a lack of objection would have allowed the trial to proceed although the adversarial process had been compromised. Counsel was delegated with the duty of ensuring that petitioner received a fair trial. His omission would not remove this court of jurisdiction, but would instead alter the focus of its constitutional inquiry.

With respect to the confrontation clause issue, this Court should take judicial notice of the Second Circuit's holding in Mason v. Scully, 16 F.3d 38. There, the court found that "defense counsel's performance fell below constitutional standard of competence by failing to object to the State's obvious violation of defendant's confrontation clause rights." Id. at 44. Similarly, on a separate note, this Court has recoursed to overturning convictions where defense counsel inexcusably failed to remedy prosecutorial

misconduct in summation.

Apparently, a finding that counsel was ineffective in the present case would be far from novel. If, in fact, counsel failed to render an appropriate protest as the People allege, this Court should reverse the judgment on grounds of ineffective assistance of counsel. The failure to object to the proposed errors and comply with the rules of preservation, and to further familiarize himself with earlier proceedings, did affect the petitioner's right to due process and equal protection. N.Y. Const. Art. I § 6 and 11. Under both the "totality" requirement of <u>People v. Baldi</u>, 54 N.Y.2d 137 (1981), or the single substantial error enunciated in <u>People v. Hobot</u>, 84 N.Y.2d 1021 (1985), appellant was prejudiced, and counsel's performance was deficient. <u>See</u>, <u>People v. Riley</u>, 101 A.D.2d 710 (4th Dep't. 1984).

Accordingly, petitioner is entitled to habeas relief by the trial courts own admission that trial counsel was deficient in his performance. These admissions were included in petitioner's C.P.L. 330.30 motions denial decision by the trial court. For the reasons mentioned herein, petitioner is entitled to habeas relief by this court.

CONCLUSION

FOR THE REASONS ADVANCED HEREIN MR.
SALNAVE'S APPLICATION FOR A WRIT OF
HABEAS CORPUS SHOULD BE GRANTED.

Respectfully submitted,

LAWRENCE T. HAUSMAN (4542)
NANCY E. LITTLE (4484)
THE LEGAL AID SOCIETY
Attorneys for Petitioner
On Points I, II and III
And LUCIEN SALNAVE, pro se
On Points IV and V

February 2009

71

## APPENDIX

# People of the State of New York v. Lucien Salnave & Tami Eldridge

My name is Debra Lynn Pomodore and I am an Assistant District Attorney in Queens County. The date is January 15th, 2002, the time is 3:25 PM. We are present in the Queens County District Attorney's Office. At this time Det. John Reynolds from the 107th Precinct is present...Lt. Ted Wess from the Queens County District Attorney's Office is present...Tami Eldridge is present and along with Tami Eldridge her attorney Andrew Worgan is present. For the purposes of voice recognition I'm going to ask each of you to identify yourselves... Det. Reynolds:

DR     Det. John Reynolds

LW     Lt. Ted Wess

TE     Tami Eldridge

AW     Andrew Worgan

DP     Now Ms. Eldridge my name is Debra Lynn Pomodore, I am the Assistant District Attorney who has been assigned to prosecute both you and Lucien Salnave in the cases that are charged against you. Today you have asked through your attorney to speak with Det. Reynolds and myself in regard to a homicide which took place in June of 1999 in Queens County, is that correct?

TE     Yes it is.

DP     What I would like for you to know is this as an Assistant District Attorney I have a continuing duty to ensure that every crime that is charged in this county is appropriately charged, and as a result if information should come forward and question that I am obligated to conduct an investigation in that regard. That is why I have agreed to speak to you. I want to be very clear as I made hopefully clear on the record on court today. I cannot make you any promises whatsoever as to what may or may not have happened after the information you supplied to me um is recorded. Do you understand that?

TE     Yes I do.

DP     And your attorney is present here with you to counsel you. At any point in time during this questioning you may ask to stop and speak to your attorney and of course we will facilitate that, do you answer, ah do you understand that?

TE     Yes I do.

DP     And we are not going to ah re-read you your Miranda warnings which I believe have been

read to you twice but we will not do that in light of the fact that your attorney is already present and he has been the one who has asked that he be present here and speak with you. Do you understand that?

TE    Yes I do.

DP    Ok, what I'm going to do now is I'd like to turn the ah questioning over to Det. Reynolds who is the case detective, and I want to stress to you Ms. Eldridge that it is of the utmost importance that you speak absolutely honestly about everything that you are about to tell us, alright?

TE    Yes.

DP    Det. Reynolds.

DR    Alright Tami, how are you doing?

TE    Fine.

DR    I understand that you want to speak to us about a ah homicide investigation we conducted back in June of 1999

TE    Right.

DR    I would like to just hear from you in your own words first what if anything you have to say to us.

TE    Ah in fact the homicide ya'll have that happened the 19th I think of June, 1999.

DR    Yes.

TE    Ya'll saying, Lucien Salnave who is my co-defendant, ya'll feel he had something to do with it. I know for a fact he didn't.

DR    How do you know that?

TE    Because I'm the one that killed the man. Then as he laid there shot him again in the head while he was on the ground outside.

DR    Will you explain to us how that took place?

TE    Um my motive was robbery, of course. Um he had pulled in to a parking section. It was on a, on a hill away from the hotel a couple of blocks from the hotel....Um... when he had pulled in he was about to step outside of the car and I had intervened, of course....as he

2

opened the door and I put a gun to his head and told him to either slide over or he would die where he sitting...and he did so, he slid over and of course he was like um "I hope you're not going to kill me" and things like that. I said, "I'm not trying to kill you, I just want your money". And I was sitting there, but the car was practically still on 'cos he was probably looking for the club, cause the door was open and the lights were, and the music was on so the car was still on. Um that's when I said "Well, I gotta get out of this area, " and I told him "Put the seat belt on and lock is side of the door". And that's when I put the gun on my lap and I pulled out the ah parking space which was a tight squeeze because at that time of the night, everything was it was crowded... in the parking spaces. And I pulled out and I began driving around the neighborhood. I've been through a whole lot of neighborhoods in that area ,so I know the area very well. I drove around the area, and into talking to him he was just holding a conversation he was saying he don't want to die, he'd been through a lot and things like that. And I was asking him how old he was, and things like that. I was just trying to calm him down because he as making me nervous, so I was trying to calm him down. And he was telling me how his family went on vacation, they're not there, he's young, he got a girlfriend and then he talking about how him and his girlfriend had got into an argument and I'm like "I don't want to hear this". Then I had noticed that he had a chain on his neck and a bracelet, he said  I think he got for his 18th birthday. And I was like "Take that off" And I saw him take it off and he gave it to me. He was like "That's all you want?" And I was like ,"No, I'll talk to you about that later, I got somewhere to go  right now". Then he, he was kind of quiet and I was just driving around. Then he started fidgeting, making me nervous. And I was like "Whatcha doing?" And he was like "I'm not doing nothing" He was like "Are you gonna drop me off?" That's when he started really irritating the situation. I was like look "I'm gonna drop you off, I'm gonna drop you off". And that's when I came to the lake, ah I call it the lake, I don't know what ya'll call it but it's still in Queens, to the lake where I killed the man. And I was pulling up slow and he was like "Oh you're gonna finally drop me off, you're gonna finally drop me off?" And that's when I turned to him and said "I'm gonna drop you off?" And that's when I lifted the gun and shot him in the temple part and he like leaned forward after I shot him the first time, he leaned forward and his head hit the dashboard and that's when blood started getting all over the floor and stuff like that, and that's when I stopped the car cause it was still going and I stopped the car, jerked the car. And I got out of the car and I took the gun with me, I got around the other side I opened the door and I had pulled him out....I thought he was dead, he wasn't. So, when I went to go into his wallet in his back pocket he had his wallet and he had an extra wallet the one ya'll found on me the one with his license cos (inaudible)he had that wallet and a regular wallet on him and I just put it in my pocket. And he turns his head and which was facing like the left side, the left way, I had shot him in the head again at point blank range. I got back in the car and I bounced.

DR    I'm not clear where did you leave him?

TE    Right there on the, its like dirt right there in front of the lake. I wouldn't call it a park case a park  has swings and things like that, but it was the dirt area right there on the hill, close

by that school that's on the hill. A high school I think it is. And... I haven't been out for so long...um... right there, right um on the hill across the street from the school I think it is, in front of the lake in the dirt area yeah.

DR    And how did he get out into this dirt area?

TE    I had dragged him outta of the car.

DR    You dragged him?

TE    I had dragged him out of the car, out of his shoes, he didn't have any shoes on cause they was left way in the car. He had no shoes on. And ah that's when I entered back into the car after I had shot him at point blank range in the head.

DR    Do you remember what position you left him in?

TE    Yes he was lying face, well I couldn't say face down cause his head was turned to the side, face down, like I said the left leg he was standing on the outside of the car in front of the door, his head was facing the left side and I shot him point blank range again. And his arms were flat against his side (inaudible) and I got back in the car after I took his wallet.

DR    What was in the wallet?

TE    Well, after I didn't even realize that there was $22 in the wallet until I went through the wallet on the dresser. When I got back to the hotel Lucien was there and I had threw the wallet back on the dresser and he was like "Where you was?" And I was like "There you go in my business"and he opened the wallet up and he was like "Who did you rob?" And I said "No body". And he opened it and he said, "There's only $22 in here, what you spent" and I said "Twenty two dollars?" And he was like "Yeah" and that's when I pulled the chain and the bracelet out and he was like "Where did you get this from?" and I said "This is for you" and I really didn't say nothing until the next morning...

DR    What did you do with the chain?

TE    The chain, um I think Lucien pawned that chain. I gave it to him. I wanted him to have it. I gave it to him. It wasn't even to be pawned but I think after a while he did pawn it I'm not sure but I think.

DR    Do you know where did he may have pawned it?

TE    Um that pawn shop that I showed, was it ya'll?

DR    It wasn't me, no.

TE    Then I showed the detective that probably the jewelry was in there.

DR    Where's that?

TE    The one on Sutphin if I'm not mistaken.

DR    Sutphin?

TE    Right.

DR    Ok and the bracelet what happened to the bracelet?

TE    It was a, it was a set, I assume.

DR    Ok, do you remember what this individual might have been wearing?

TE    No it's been a minute um,

DR    Could you describe it any way?

TE    Um I think he came from work, I think he had the light blue jeans on.

DR    Light blue jeans?

TE    Yeah if I'm not mistaken(inaudible) but I think, I think he just had regular jeans on.

DR    Regular jeans.

TE    I know his shoes was black and they was like a half size bigger like Orthodox Jews wear, he had some kind of like clog shoes on, they was black clog like shoes on that he slipped right out of them when I was pulling him out of the car.

DR    What happened to the shoes?

TE    I ditched them somewhere.

DR    You ditched them somewhere?

TE    Yeah.

TW    You made mention that when you were driving around with this ah person you had a conversation you were speaking to him?

TE    Yeah, to calm him down.

TW    What, what, do you recall that conversation?

TE    Oh he was telling me his mother I think and father was on vacation, he was like nobody's at the house, you could rob my house or whatever, nobody's there.  And then he was showing me some little beeper he had, and that his brother was going to be calling cause his brother's a cop, and I was like "whatever" just put the beeper on the visor I don't want to hear that and I was telling him to turn the beeper off, which I don't think he did, cause later that day I found a lot of beeps in there. Um yeah he was telling me his brother was a cop, and um he said him and his girlfriend had, just had an argument and I was like "I know you didn't beat her up?" and he was like "No we just had a real heated argument"

DR    Did he say her name to you at all?

TE    No, he didn't

DR    Did he, did he tell you what he did for a living?

TE    No but later in the car I found like some like cement laying stuff so I assume he was in construction.

DR    Cement work?

TE    Yeah, (inaudible)

DR    He had like those kind of work clothes?

TE    Yeah he had on dirty, light blue pants that looked like regular jeans, probably Levis.

TW    And when you spoke to him, how did he,  what language did he speak?

TE    Kind of foreign, he was...um..he spoke like he was kind of Arabian

TW    Arabian?

TE    Yeah he had a distant accent. I'm trying to figure, I'm trying to remember because he was saying when his mother and father went on vacation I'm trying to think of remember where they went, cause he had told me where they went, I can't recall, because he did have a foreign accent.  I'm not sure I think his mother and father had went back to their country for vacation, I'm not sure, I'm not sure.

DR    Ok,

6

TW     So after all, after all this is over now

TE     Ahum

TW     What do you do next?

TE     Um I took the car to the car wash over there on Jamaica and Guy R. Brewer, across the street from the pizza parlor, that big gas station that has a self-wash,

DR     Ok,

TE     It has a self-wash and I had took it over there cause it was mad blood all over the dashboard.  All over the seat, and where you turn the gears at between the passenger's side and the drivers' side

DR     Ah hum

TE     It was a lot, there was a lot of blood there and I wanted to find the shell from that one bullet that I shot him with in the car.

DR     Did you find it?

TE     Yes.

DR     What happened to that?

TE     I threw it away like I was supposed to...

DR     What else happened then?

TE     I cleaned up as much as I could, the blood was not going to come out and I took my grey sweatshirt... I had a grey sweatshirt on that night, it was a Champions sweatshirt and I had put it over the seat and I cleaned it the best way I can, and put some um, some shampoo stuff on the floor and I had  put, he had towels in the back of the trunk and I put the towels over some of the blood, and I threw it all in the dumpster right there by the car wash.

DR     Ok... now during this time that you're out that you encounter this individual are you alone?

TE     Yes.

DR     Do you remember where the encounter took place?

TE     Yeah, well on the hill, in front of the  building...h.

DR     Do you remember a street name or an address?

TE     I'm not from that area...it's in Briarwood, of course...it's right up the block from the hotel.

DR     Ok,

TE     Um I don't know the street name there I don't know the street name there.

DR     OK, and the, the gun that you had this day what happened to that gun?

TE     Ya'll took it.

DR     We took it...That's the gun that you got arrested with?

TE     Ah hum, that's why I still had it on me.

DR     Alright...Did there come...did anybody else go in that car besides yourself ...after you had cleaned it?

TE     Yeah,

DR     Who was that?

TE     I drove my kids and stuff around in that car, me Lucien... that was our A to B car....after that

DR     What does that mean A to B car?

TE     To get from one place to the next

DR     Ok

TE     Yeah...we drove around in that car...and I drove...I always drove...Lucien can't even drive.

DR     Now I'm under the impression also that you had made mention that Lucien was out also that night...that you had split up?

TE     Yeah we had went out that night together because we had a little baby sitter .... his friend ... doing us a favor.  And we was supposed to go over to my friend house and we got into a little stinking'argument...as usual...and he was like "Well you're going over to Tami ca's house and  was like "Yeah I'm gonna Tamica's house and I never went".

DR     Do you know where he went?

8

TE    I think he went to his friend house, the Dred... I forgot his name...Q. I know him by Q Ya'll also know him by Q

DR    Q?

TE    Yeah...

DR    Q?

TE    Yeah I think he went to Q's house.

DR    Ok...

TE I.    Cause he beat me back ...he was there he was back...he was back a way long time before

DR    Ok...

DP    Um I'm going to ask you a few questions about some of the things that you said.

TE    Ah hum,

DP    I want to clarify them... First of all you told me that you had a baby sitter that night...do you know the name of the baby sitter?

TE    His friend named Chris.

DP    Was that Chris Bash

TE    He's a Puerto Rican, light skinned...yeah I guess that's him.

DP    And how did he come to be the babysitter that night?

TE    Because he knew that we was leaving out of town the next day and he wanted to stay with Lucien and he said he'll watch the kids for us and we would hang out the next day all together.

DP    Now when you left the hotel was Chris there?

TE    Yeah.

DP    Did you leave your children with Chris?

TE    Yes.

DP    Now you left with Lucien do? Yeah, do you know approximately what time you had left?

TE    I'm trying to think if it was already dark, yeah it was already dark.

DP    So about what time was that? Were the children already in bed?

TE    Um the summertime, I figure 8 o'clock my children was already in bed (inaudible) it must have been around 8 o'clock.

DP    So when you and Lucien left and you left Chris there...

TE    Right

DP    Where did you set out to?

TE    We went to that dinner that's right there.

DP    Where the Flagship?

TE    I'll remember it after a minute. We went to the dinner that's right there you know after the gas station

DP    Is it on Queens Boulevard?

TE    Yes, the 24 hours.

DP    Ok so you went to the dinner?

TE    Yeah and that's when he was like "Well where you going?" I said I was going to Tamica's house since you don't want to be with me tonight "I'm gonna go to Tamica's house"

DP    Well what made you feel that he did not want to be with you that night?

TE    Cause we had an argument cos I didn't want to go out he didn't want to leave. He didn't want to go out. I wanted to go back to Louisiana. That's all I kept telling him "I want to go back to Louisiana" We don't have the money and I kept getting frustrated and I was like well "I'm gonna get the money, I'm gonna get the money, that's all he kept saying "I'm gonna get the money, I'm gonna get the money".

DP    Now did he have means or ways of getting money previously since you've been back in New York?

TE    No, he had showed me a little bit of money now and then, and I'd be like, "Look I, I cant deal with this"

DP    Did you ever ask him where that money came from?

TE    No I never questioned things he did, just like he never questioned things I did.

DP    Now you mentioned that when you split up with him he went someplace and you went another place?

TE    Right.

DP    On that same night?

TE    Yeah cause my friend is in walking distance from that hotel.

DP    And where is that at?

TE    She lives on 164th off of Queens Blvd.

DP    And what did you say her name was?

TE    Tamica Hightowers

DP    Alright did you go to Tamica Hightower's house?

TE    I never made it there,  I was walking and I went back up that hill, that's how I got up that hill.

DP    So how is it you encounter this person that you say you shot?

TE    Cause I was standing, cause there's a lot of um like Lincoln Town Cars drivers that live in that neighborhood and like after they finish doing what they do during the day, that's where they live at.  And that's where the moneys at. That's the kinda people I know. I hang around people that know where all the monies at, the so called money.(inaudible)

DP    So did you go to that area with the intent of committing a robbery?

TE    A robbery yes.

DP    And the gun that you had did you have it on your possession at that time?

TE    Yes and I had it on my possession, in my possession when they also found it.

DP    Where did you get that gun from?

TE    I bought it from a friend.

DP    Here in New York?

TE    Yeah.

DP    And so when you had the gun in your possession and you went to this area how is it that you spot or you see this person that you allegedly shot?

TE    You just, you just, its like its  real dark in that area, if you had ever gone to that area at night, you would know that, its real dark, its like one lamp post for the whole block and that lamp post is the beginning of the neighborhood, and as you walk up the hill it gets real dark, and I must have been out there at least 20 minutes.

DP    Were you waiting there to...

TE    Yeah, because I was tired of Lucien telling me he's gonna get money... he's gonna get money and I already had a gun and gonna get my money... I had a gun.

DP    So when was the first time that you saw this person that you went there to shoot?

TE    When he was circling the block, looking for a parking space, he's trying to find a parking space in that area.

DP    How many times did you see him do that?

TE    Twice, twice.

DP    And so where did you actually encounter him?

TE    Actually in the middle of the block, pulling into a space and he was looking like he was about to get out, like everything was still on and he was fiddling around, looking for the club.

DP    And where were you when that was occurring?

TE    Right on the,  right like where the cars were at.

DP    Ok...

TE    And I was watching him.

12

DP    Did you come up from behind him or from...

TE    I came right in front of him as he had his leg outta the car...he was... looking under the ah, the chair on the driver's side.

DP    Now were you able to observe anything about his face, like his coloring , his hair coloring?

TE    He had a pale face, he had light, light blue eyes, um you could tell he was young, he was real young. (inaudible) um I like I said I noticed the jeans.

DP    What about hair color?

TE    (inaudible)

DP    How about body stature?

TE    He was slender.

DP    Was he tall, short?

TE    About my height.

DP    How tall are you?

TE    I'm 5 6.

DP    And um so you said that you got into the car and you forced him over to the passenger...

TE    Yeah as I put to the gun to his head, I said "slide over" and he did.

DP    Ok and did you drive away at that point?

TE    No I sat there for a minute, cause I told him to put the seatbelt on.  I never been in a BMW and I was also asking him "How do I break the car?"  He was like just turn its already on, um just turn the light down, cause he had the lights on.

DP    Now was it, was it an automatic or was it a stick shift?

TE    It wasn't a stick shift, it was an automatic but it had that thing like right here.

DP    A console?

TE    Right

DP    In the middle of the two seats?

TE    Right.

DP    Alright now you said that you had a conversation with him while you were both in the car, is that right?

TE    Right.

DP    And he told you according to you that he and his girlfriend had an argument?

TE    Yes.

DP    Did he tell you where that took place?

TE    I think he also was on vacation too. I think he went on a trip with his girl they had a heated argument and they came back...

DP    So the argument didn't happen just moments before?

TE    No, no. He was just, he felt like he was getting out of the relationship with her.

DP    Now how long a period of time did you drive around with him in the car?

TE    Um roughly 30 minutes.

DP    At any point during that 30 minute period of time did he try to jump out of the car?

TE    No...

DP    Is there anything that would indicate to you that he was trying to escape from the car?

TE    No, no, cause he was too busy talking, thinking that he was going to get out of the car, that I was going to let him go.

DP    Did, when was the first time in the car that you asked him um or demand of him anything of his personal property?

TE    The, the chain and the bracelet when I, when I noticed it cause I was too busy driving I think it was at a light on Hillside Avenue and um I had noticed it cause I was talking to him cause I was kind of getting upset and I noticed it. "Alright give me that chain and that bracelet"

14

DP    Did he do that?

TE    He was like "You can have it, you can have it" "Are you going to let me go home?" after he gave it to me.

DP    Now when did you ask ah for the wallet?

TE    I didn't ask for it.

DP    You didn't ask for it?

TE    No, I already put the second bullet in his head when I took the wallet out.

DP    So you actually went on to his body?

TE    Ah hum

DP    ...and felt it?   Did you ask him  if he had any money on him?

TE    He said he had a wallet.

DP    Did you ask him how much money he had?

TE    No.

DP    Now how long a period of time did you drive around before you fired the first shot?

TE    I would say 30 minutes

DP    And where were you in the vicinity of Queens when you first shot him?

TE    I think that's still considered Briarwood. I was closer to Hillside I was only a block from Hillside cause it was right by the high school.

DP    Now was the car still running when you fired that shot?

TE    Yes it was, that's why I had to put on the brake when he was shot.

DP    Did you stop first and then shoot him?

TE    No, it was slowing and I had my foot on the gas light and that's when I was moving slow. That's when I had already  decided that I had to shoot him.

DP    Well why did you decide that you had to shoot him?

TE    Because he was getting on my nerves.

DP    And you picked up the gun, you said previously that the gun was in the middle of the, on your lap I think you said?

TE    Yeah it was every now and then I would put it in my hand, but you couldn't drive like that so I would put it in my lap right here.

DP    Ok so you picked up the gun and how did you shoot him, could you just show me?

TE    Like this.

DP    So you turned your body to the, to the right, and you pointed the gun?

TE    Ah hum

DP    At his temple?

TE    Ah hum

DP    Did the gun actually touch the temple?

TE    No.

DP    Was it close?

TE    It didn't touch the temple, but it was sitting next to him.

DP    And did it happen fast, so that he did not realize?

TE    It happened fast, he didn't realize cos he was looking straight so, (inaudible), he didn't.

DP    Now after you fired the first shot you said that his head hit the dashboard?

TE    Yes, he went to lean over and that's when he, you can actually hear the blood come drip on the floor and some of the blood was, that same sweatshirt that I used in the car had some of that blood get splatted on that arm, that's how you can tell that I was wearing it, on the arm a little bit. (inaudible) the console, some was where the console was that's when he leaned over toward the dashboard and I took my hand and pushed him back and that's when I got out.

DP    Now you said that you stopped the car at the location?

TE    After the first shot, right.

16

DP    And you got out of the car, did you actually turn the engine off or did you leave it running?

TE    I just put the um (inaudible), I left it running, I just put the thing in park

DP    Ok, and which way did you go around the car?

TE    To the, to the trunk.

DP    Around the trunk?

TE    Right.

DP    And when you got to the other side of the door what did you do?

TE    That's when I opened it and he was like some of his body slumped out and that's when I grabbed him.

DP    Can you describe to me how you grabbed him?

TE    Yes I grabbed him by the shoulders and like I said he was leaned over, and I pushed him back up, he was sitting back by that time cos I had pushed him back and I had just grabbed him with my two hands by his sweater shirt the kind of shirt that he had on.

DP    Where on his body, in other words I'm trying to visualize what you're saying?

TE    The shoulder, arm, like part of his blades, his shoulder.

DP    So you

DR    So you... you just pulled on his clothing?

TE    Right

DR    And pulled him out?

TE    Right.

DP    And when you pulled him out how did his body come out?

TE    Um his arm and shoulder came out first, then his head came to a slump, and as I pulled him out the rest of his body just fell out he just came right out of his shoes.

DP    And he came out, did you have to put your arms, your hands under his armpits

to help him out?

TE    No, I used one arm, it was his right arm.

DP    So you pulled him on the right arm out, did you drag him or did you?

TE    A little bit to put him up on the sidewalk part, a little bit.

DP    And which way was he facing at this point?

TE    I don't know, as I pulled him out I don't know which way he was facing.

DP    In other words was his face down, or was his face up?

TE    No I don't think he was ever face down. I don't remember ever seeing him face down like that (inaudible)

DP    Now how was he when you left him?

TE    He was to the side facing I think the left side (inaudible)

DP    Well when you say facing left would you?

TE    Cause I was standing at his feet he was facing the left side with his side face down like that.

DP    So in other words the left cheek or left face would be the one that would be open?

TE    Right, right.

DP    Did you have to drag him along any cement or any, ah any grass or anything?

TE    I think it was dirt it wasn't or grass it was like a dirtied area cos the cement is it was right there just before the lake and then it's grass, I think its dirt, dirt.

DP    So you don't recall dragging him over any cement or anything like that?

TE    No I just pulled him up on the sidewalk part right there.

DP    Now what made you say that you believed he was still alive at that point?

TE    Cause he was, you could hear him mumbling before I shot him the second time, he was, he was mumbling and that's when I said "Oh God, he's still alive" and that's when I shot

18

him again at point blank range.

DP    You said point blank range, what do you mean by that?

TE    I was standing right over him.

DP    Did the gun ah

TE    touch him, no.

DP    Where did you shoot him the second time?

TE    In his head.

DR    What

DP    Part of the head?

TE    If his head was turned... I guess the skull area right here.

DP    Ok so your pointing for me...

TE    ...like right here.

DP    Ah the left side of the head in the back?

TE    Ah hum.

DP    Is that a fair estimate Mr Worgan?
      Yes?

AW    That's good.

DP    And then what happened to the, did the gun discharge a shell at that point?

TE    Yes it did.

DP    And what happened to that?

TE    I didn't get that one.

DP    You didn't look for it?

TE    No, the dark there, there was a lamp post but it was a shaded area where I was.

DP    Ok so that shell was ejected then?

TE    No just the one in the car.

DP    In other words did you ever check the gun to see if the shell had ejected out?

TE    I didn't even pay it no mind. I had the gun later that day, that morning rather, I would say

DP    Did you know how many shells were in the gun in the morning?

TE    It was left the same amount they found me with. I never touched the gun after that.

DP    But the morning I'm talking about before you actually shot him was the gun fully loaded at that time?

TE    No there was three in there.

DP    And you shot him twice?

TE    Right.

DP    So there was one remaining live round?

TE    Ah hum.

DP    So now after you shot him you left him in this area and drove away correct?

TE    Yes.

DP    Where did you go?

TE    Um I drove around for a minute and then I went to the car, carwash.

DP    And when you went to the car wash did anybody notice the blood inside of the car?

TE    No, nobody be out that time of night... (inaudible)

DP    So its wasn't an internal car wash it only was for the outside?

TE    Yes.  The outside of the car, it's a power wash.

DP    Why did you wash the outside of the car?

TE    Cause I was just cleaning it, just cleaning it... it was kind of dusty.

DP    But it just wasn't to get any blood off the outside of the car?

TE    No there was no blood on the outside of the car, it was just the cavity around the door, the seatbelt of course, the inside of the floor, the console had just traces stuff on it ah I was looking for the shell and the seating area there was a lot of blood there.

DP    Now when you say the seat area which seat are you referring to?

TE    His seat.

DP    The passenger seat?

TE    Right.

DP    The front passenger seat?

TE    Ah hum.

DP    Um did any of that blood seem to seep anywhere else?

TE    Nope, just in his little section.

DP    Now after you did the car wash where did you go?

TE    I went back to the hotel.

DP    And when you got back to the hotel who was there?

TE    Lucien was there, Chris was there, my kids was out, that was it.

DP    Chris was still there?

TE    Ah hum he left after I left cause I said "Do you want a ride back?" and he said "I ain't getting in no stolen car" and that's when Lucien walked him to the front and he left.

DP    Did you show him the car at that point?

TE    No, Chris, he didn't see the car.

DP    Did you show Lucien the car at that point?

TE    No Lucien didn't see the car until the next morning.

DP    So you didn't, did you discuss it with him the car?

TE    He didn't no, that was kind of a morning thing, that night he didn't even know I pulled up in a car I just asked Chris "Do you want a ride?"  And he was like "You don't have no car, I 'm not getting in no stolen car" and we didn't discuss it.

DP    Did he say that in front of Lucien?

TE    Yeah.

DP    And then Lucien didn't even ask you where did you get the car from?

TE    Umum he didn't even you, no he didn't say nothing about it.

DP    Now the next morning how was it that you had a discussion with about the car?

TE    He was still questioning me about where I get the wallet from.

DP    Was the identification of the victim

TE    ah hum

DP    in the wallet?

TE    Yeah a whole lot of papers cos he was trying to sell his car, it things was like that was in there, numbers of people who were trying to buy his car, um there was a lot of information mostly about his car, because he wasn't the owner.

DP    Had he discussed that with you or you had just seen that from the documents?

TE    I seen it from the documents. Cause he was just saying that he wasn't the owner of the car.

DP    He told you that he was not the owner?

TE    Yeah, he was saying I think brother, cousin something like that.  He wasn't the owner of the car he kept saying.  He was trying to sell it.  I think the license, I think the insurance or something was in somebodies else's name.

DP    Ok, now what was, what did Lucien say to you when you told him that you had shot somebody?

TE    He didn't believe me. I said "Alright you don't have to believe me" And then then when we went to see the car, when I took him out to the car cause I was like "Look I want to go see my family so we can go back to Louisiana" I said "If this is all the money I got I don't know what I want to do, I want to go and see my family"

DP    You said that?

TE    Yeah and he was like um he said when we, um he say went out to the car, we had the kids and stuff like that and he said "I don't believe you really did it?" "Really did what, I told you" I'm trying to get money I'm trying to get outta here" And he was like "Well you obviously didn't get no money we're broke".

DP    How much ah how many details that you did you explain to him?

TE    Everything. I told him everything. Except for things that he wouldn't know unless he was there involved in the conversation I had with I think his name is Yuri, the conversation I had with him, he wouldn't know that, he wouldn't know about, he wouldn't even know about how I pulled him out of the car, I didn't even know if I told him about the shoes being left in the car. I don't think he knew that neither.

DP    Now let me ask you ah a little bit about your interactions with the police when you got to the precinct that day

TE    Ah hum

DP    You've admitted that you had the gun on your body right?

TE    Yeah, because I was about to go in the precinct and I didn't want them to find the gun on me

DP    Ok ah you were interviewed in fact I think Det Reynolds right here interviewed you?

TE    Sure did, yes he did.

DP    And he asked you what happened?

TE    Ah hum

DP    And you did not tell Det. Reynolds any of what you told us here today?

TE    No, of course not. Well I thought I was walking out of the jail, thought I was walking out of the precinct , all I had was a gun.

DP    Well did you tell Det Reynolds anything about Lucien robbing somebody of $22?

TE    Did I, I don't think I did if I did but I don't know I don't remember.

DP    When this first occurred and you were at the precinct do you recall whether or not you said to either Det Reynolds or any other detective that you may have spoken to that Lucien committed the robbery.

TE    Yeah he committed robberies before I probably said that.

DP    In particular the robbery of this fellow that you said was Yuri?

TE    I don't recall

DP    Ok

TE    I probably did

DP    I just want to ask you when you spoke to    another detective not Det Reynolds but Det Brian Quinn or Louis Pia... I don't know if you recall the names but they took a written statement from you? Do you remember that?

TE    Ok,

DP    And in that statement did you say that you were sitting at the end of the bed and Lucien said, he did this for $22? "We got a car, we have a way to get away. Ah around for $22 and killed him?"

TE    Ah hum

DP    So did you tell the police that Lucien told you that he had killed the person?

TE    Yes, I did.

DP    And at that point in time that was only a day after the shooting had occurred is that right?

TE    Ah hum

DP    Did you admit to the police that you were present?

TE    I was present where?

DP    In the car at the shooting?

TE    No that wasn't in my statement.

DP    No that's what I have asked you....

TE    Oh ok.

DP    And at this point in time um I want to ask you whether or not Lucien was present with you?

TE    No ma'am he wasn't.

DP    Was he in the car at any point in time during the events that you have described?

TE    No.

DP    Up until the shooting?

TE    No, no ma'am

DP    You realize that what you have just described to us is, is an admission to a crime?

TE    Yes I know that.

DP    And why is that in this point in time you have decided to do this?

TE    Because um I guess you would say that you have time to think about things, and the way they're proceeding towards Lucien doing this murder which he didn't do, I just can't deal with it. And I was trying to write him, I wrote him so many letters telling him "Why won't you confess to what really happened?" You know you didn't do it. Tell them you didn't have nothing to do with it" You cant get me out of certain things, I have to deal with this the rest of my life." And he told me that he would rather be in jail the rest of his life then to tell the truth.

DP    Do you feel that is a protection for you?

TE    Yeah it is a protection for me, it is but its something I cant, I cant live with he's too young for that. I can't live with that.

DP    Since you have been in jail did you have an opportunity to have any conversation with him?

TE    No not one on one all I can do is I can write letters.

DP    And has he written back to you?

TE    He writes back, he pays me no mind he curses me out telling me don't do this, if he hears, he, he's gonna have a fit.  He's gonna go crazy.

DP    Well let me ask you this is there any  letter or document that you could provide to me that he has sent to you thus far that might reflect what you're saying the interaction on paper that you have between the two of you.

TE    Most of my letters are sent to him.  I was telling him to tell the truth about what I did. Almost every letter I sent Lucien is like, "When are you going to give this up? When are you going to tell the truth?" You didn't have nothing to do with it.

DP    Well, you do understand that he is charged with six other robberies?  You know that right?

TE    I understand.

DP    And he ever discussed those robberies with you?

TE    No I only know of one robbery that Lucien did and that had to do with a watch in the same neighborhood that I was in he took a watch.

DP    And that was a watch you previously told Det Reynolds

TE    Yeah

DP    That you pawned it was a Guess watch?

TE    Right.

DP    You pawned that at that same location?

TE    Exactly.  That's the only robbery I even know if he did any robbery. That's the only one that he's admitted to me.

DP    Now do you have any, did you have any nickname you called each other, or nothing personal

TE    (laughs)

DP    Did you have, did you have any nickname that you used for him or him for you or used for each other?

TE    We called each other Ti Lu, Tami and Lucien.  My nickname on the street is Trigger, Trigonometry.

DP    And what does that signify?

TE    The study of pulling a gun

DP    Oh Trigonometry?

TE    Yeah.  The study of pulling the trigger.

DP    And with regard to this particular weapon this is not a weapon that you got in Louisiana?

TE    No not that one, the one I got in Louisiana they took from Lucien the first time he got arrested.

DP    That was in the 105 Precinct?

TE    Right, correct.

DP    And how did it come to be that he was in possession of that weapon?

TE    Because it  was in his duffel bag which he didn't even know about, that was my duffel bag he was planning a trip to come to New York and I was supposed to come with him, which I decided at the last minute not to come that's how it ended up in his bag. So I figure he found it in his bag and was acting a fool as young people do and that's how he got caught with it.

DP    Well when you say young how old are you?

TE    I'm 28.

DP    You're 28 as we sit here today?

TE    Yes I am.

DP    And how old is Lucien?

TE    I think he's 22, if I'm not mistaken February 28th he was born in 80 I think he's 22.

DP    Now is there any reason at all that you would be unwilling or reluctant to admit if he was in the car with you?

TE    No because if he did it, I'd  be damned if I would spend the rest of

my life in jail if convicted and I have two kids out there, if he did it he did it"
If he didn't do I feel that the person who did it really should say something and that's why
I'm here.

DP    What about participation in it in other words?

TE    If he had participation I would not be taking the weight by myself.

DP    So if he was there with you in that car

TE    I would surely be telling you that right now.

DP    So I want to understand you very clearly because obviously you understand the grave
importance of what you're doing, are you telling me Tami that during the course of the
robbery of this man you called Yuri,

TE    Ah hum

DP    Of his BMW and of the shooting of him that Lucien was never with you?

TE    No he was not.

TW    You said when you asked him ah for money he said that it was in his wallet?

TE    He didn't say he had money in his wallet he just said "I have a wallet".
Right he just said "I have a wallet".

TW    Ok now did you plan on taking that wallet?

TE    Yes, I planned to take it of course

TW    Now at what point did you decide you were going to shoot him?

TE    Um it wasn't even in me for me to even shoot him it happened, it just happened, and I was
like "Oh God I don't need nobody sitting there telling me that I put a gun to their head
or go to jail". So that's when I killed him.

DP    So its like you were worried that he might identify you?

TE    Right, cause we had a thirty minute conversation I was in the car with him
for thirty minutes.

DP    Was that in the original plan to kill him?

28

TE    That it wasn't.

DP    But you didn't have anything shielding your face, did you?

TE    No I didn't.  It was a spur of the moment thing, I was upset it, it was a spur of the moment thing.  You know what I can do this myself.  I gotta get out of here, I don't wanna be here, that's what the motive was to get back to Louisiana, go get out of New York.

DP    Det Reynolds?

DR    I have no further questions.

DP    Ms Eldridge is there anything else that I have not asked you or Det Reynolds have not asked  Lt. Wess has not asked you that you would like to discuss with me or disclose to me at this point in time? Have I covered the entire incident is there any details that you may have left out that I had not asked you about?

TE    No I don't think there is, I think everything is (inaudible)

DP    You said there were two wallets did you take both of those wallets?

TE    I was found with both of them …no… I was found with just that insurance thing the other wallet I threw out cause it had all this junk in it and it had the NYPD thing on it that belonged to his brother with a little decal with a little blue decal.

DP    Do you know where you threw that?

TE    Yeah in the (laughs) over there by the pink houses in Brooklyn ah McDonalds over there. I dropped it.

DP    And how about the shoes?

TE    Somewhere in Queens Village.

DP    Just tossed them out of the car?

TE    Just tossed them out, there were in the garbage, it was somebodies garbage can tossed them out.

DP    So let me just ask one more time is there anything else that you can think of that you have ah told me or what like to say to me any other information that you would like to provide?

TE    No I think that's it.

29

DP    Now finally let me ask you as I keep repeating do you understand Lucien Salnave is charged with a series of robberies?

TE    I understand that.

DP    Did you participate in any of those robberies?

TE    No

DP    In other words you weren't a look out you didn't wait around the corner or anything like that?

TE    Nah.

DP    With regard to the clothing that was recovered from your person at the time of your arrest at the precinct you had on sweat pants is that right?

TE    Ah hum my grey sweat pants, oversized, yes.

DP    And did you have those on the night of the shooting?

TE    Yes I did, yes I did.

DP    How about I noticed that you have a wrap on?

TE    I have the black one which I got arrested with which is now gone. I had a black long thing that was wrapped around and I had a white cut sweatshirt the rest of which is also gone of course.

DP    Did you have a bandanna?

TE    No. Just a black you know a wrap around.

DP    Did Lucien have a bandanna?

TE    Did he own a bandanna he probably did. He had such a big wardrobe... I'm not sure, he probably did. Cause I wore a bandanna to sleep so if there was any bandannas in the hotel we probably each had one.

DR    I just have to ask you this question?

TE    Ah hum

DR    You said before he would get on your nerves so you just shot him?

TE      Right.

DR      How did he get on your nerves that much that you decided to shoot him?

TE      Nah, it wasn't just a getting on my nerves like I said to her,

DR      That's the words you used though.

TE      Nah I  was also to wheres I knew that he could identify me point blank
        if I let this man go free he can walk inside a precinct and, say I know who shot me and we
        were also in the area, I didn't leave yet, we I was at a hotel right down the block.

DR      Wasn't that your plan to leave though?

TE      Huh

DR      Wasn't that your plan to just get the money and leave?

TE      Huh the next day yeah right my reservations was for the next day.

DR      So the reason you killed him is not so much that he got on your nerves,
        but that he could identify you?

TE      Of course, right.

DP      Did you and Lucien ever refer to yourself as Bonnie and Clyde?

TE      No that was ya'll newspaper thing.

DP      That's not true?

TE      That had nothing to do with me.

DP      You never heard anything like that?

TE      No. No.

DP      Alright I guess this will conclude the interview it is now 4:15 PM DR Worgan
        is there anything that you might like to add?

AW      No.

DP      Ms Eldridge we're concluding is that the sum total of everything you want to
        discuss with me today?

31

TE     Yes it is.

DP     Ok, thank you

DR     Thank you.



# New York City Police Department









NAME : **SALNAVE, LUCIEN**

NYSID #       :  **9218154Q**
Arrest #      :  **Q99031126-R**
Arrest Date   :  **06/17/1999**

| Race | : **BLACK** | Height | : **5' 9"** | Hair Color | : **BLACK** |
|------|-------------|--------|-------------|------------|--------------|
| Sex  | : **MALE**  | Weight | : **160**₃₃ | Eye Color  | : **BROWN**  |

Printed at: nyopp_d2                                                    on: 09/23/2002  15:33 hrs.



34

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x

LUCIEN SALNAVE,

               Petitioner,

            -v-

ROBERT ERCOLE, Superintendent of Green Haven
Correctional Facility, et al,

              Respondents.

----------------------------------------------------------------x

        CV-08-5096
        (Vitaliano, J.)

       AFFIRMATION
       OF SERVICE

Nancy E Little hereby affirms under penalty of perjury:

    I am licensed to practice law in the State of New York and I am a member of the bar of this Court. I hereby affirm that, on February 27, 2009, the attached Memorandum of Law and Appendix in Support of Petition for Writ of Habeas Corpus was served upon Andrew Cuomo, Attorney General of New York [attn: Alyson Gill, Chief, Habeas Corpus Unit], the attorney of record for respondents, at 120 Broadway, 22nd floor, New York, New York 100271, the address designated by them for that purpose, by depositing two true copies of the same in a post-paid, properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Post Office Department within the State of New York.

Dated: New York, New York
       February 27, 2009

                       *Nancy E Little*
                      Nancy E. Little (4484)