UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUL 3 - 2014 ★

BROOKLYN OFFICE

------------------------------------------------------------x

LUCIEN SALNAVE,

                      Petitioner,

    -against-

ROBERT ERCOLE, Superintendent, Green
Haven Correctional Facility,

                      Respondent.

------------------------------------------------------------x

**MEMORANDUM & ORDER**

08-cv-5096 (ENV)

**VITALIANO, D.J.,**

    Petitioner Lucien Salnave brings this petition for a writ of *habeas corpus*,

pursuant to 28 U.S.C. § 2254, against the superintendent of Green Haven

Correctional Facility.[1] On March 14, 2003, petitioner was convicted, after a jury

trial, in Supreme Court, Queens County, of one count of murder in the second

degree, and three counts of robbery in the first degree. On December 10, 2003, he

was sentenced on the robbery convictions to one term of eight years imprisonment,

and two terms of 12 years, to be served consecutively, and, on the murder count, to

an indeterminate term of 20 years to life, for a total indeterminate sentence of 40

---

[1] On his myriad claims for federal habeas relief, Salnave appears both through
counsel and *pro se*. He is represented by counsel with respect to his claim that the
evidence supporting his conviction as to one count of robbery was legally
insufficient, and also his claims that his due process right to a fair trial was denied
by the trial court's evidentiary rulings and jury charges. On all other grounds,
petitioner proceeds *pro se*. Such hybrid representation is disfavored, but given the
nature of these proceedings, the Court permits it to facilitate a disposition of all
arguable grievances.

1

years to life imprisonment. Salnave now argues that his right to due process was denied at trial, that insufficient evidence supported his conviction for one of the robberies, and that his trial counsel was ineffective.[2] For the reasons set forth below, the writ is denied and Salnave's petition is dismissed.

## Background[3]

### A. The June 1999 Robberies and Murder

On June 6, 1999, Salnave checked into the Jets Motel, located in the Briarwood section of Queens, with his girlfriend, Tami Eldridge, and her two daughters. (Tr. 1694). The group had travelled from Louisiana some time earlier, as they had been in Queens since at least May of that year. *See* (Tr. 1953–54). They came in advance of petitioner's July 12 court date, on gun charges pending against

---

[2] After the instant petition was fully briefed by both sides, petitioner, moving *pro se*, sought to amend his petition. He announced that he had "returned to the state court[] while his *habeas corpus* petition has been pending to exhaust fundamental constitutional claims that had not been exhausted," namely, claims that (1) the trial court's rulings had forced his counsel to be ineffective, and (2) the trial court had lacked jurisdiction over his trial because the indictment had been predicated entirely on hearsay. (Pet. Aff. 3, ECF No. 18). On January 25, 2011, the Court granted Salnave leave to amend his petition, but he never did so, in spite of the fact that the Court extended him more time to file, *sua sponte*. The Court takes notice that petitioner raised these after-thought claims in a proceeding pursuant to C.P.L. § 440.10, which were denied on June 18, 2010. *People v. Salnave*, Ind. No. 1416/00 (Sup. Ct. Queens Cty., June 18, 2010). To the extent that petitioner may still mean to litigate the additional claims raised in his § 440.10 motion, the Court observes that Supreme Court found them to be procedurally barred, and thus defaulted. Thus, they would be defaulted here, too. Further, if these claims properly before the Court, they would be found to be substantively without merit.

[3] Because Salnave was convicted, the Court recites the facts in the light most favorable to the verdict. *See Garbutt v. Conway*, 688 F.3d 79, 80 (2d Cir. 2012).

him in Kings County, where he and Eldridge had previously lived together.

Around the same time, Briarwood was under siege by a series of armed robberies. On June 3, 1999, Preet Multani was robbed on 139th Street at 87th Road. (Tr. 891).[4] Six days later, as Karlene Stewart walked home from a bodega on Highland Avenue, she was mugged by a man who had been stalking her. At the intersection of Highland and 165th Street, Stewart felt a gun behind her ear, and turned to see the man than she had seen following her earlier. She would later identify Salnave as her attacker. The assailant demanded that she give him her money, stripping away her purse. (Tr. 667–679). A few days later, on June 12, shortly after midnight, Herman Canjura and Manuel Camano were approached by Salnave, who asked to join their game of dice in front of Canjura's home on 139th Street. After playing for about a quarter hour, Canjura got up to leave, at which point Salnave drew a silver gun, stuck it in Canjura's stomach, and demanded his money, before turning on Camano and taking his gold bracelet. (Tr. 701–45). Salnave then fled in the direction of the Van Wyck Expressway, where he disappeared between the Jets Motel and a gas station. (Tr. 709–12, 733–35).

On June 15, 1999, around 9 p.m., Salnave and Eldridge set out from the Jets Motel with the intent of stealing a car. Eldridge's daughters were left in the care of Salnave's high school acquaintance, Christopher Baksh. (Tr. 1781–85, 1955). Salnave and Eldridge came upon Yuriy Khaimov as he was driving his family's BMW in search of a parking spot near his parent's home in Briarwood. Once the

---

[4] Petitioner was charged, but acquitted, in connection with this robbery.

3

car came to a stop, the pair approached Khaimov's driver's side door, Eldridge opened the door, brandished a gun, and demanded that Khaimov move over to the passenger seat, so that she could drive. Salnave then took the seat behind Eldridge. (Tr. 1786–87). Khaimov pled with Eldridge and Salnave not to hurt him, and offered to allow them to rob his parents' apartment if they would let him go. (Tr. 1788–89). Eldridge drove around for at least half an hour, deciding what to do with Khaimov. At some point, she ordered Khaimov to give her his jewelry, which he did. (Tr. 1789–90). Eldridge gave the loot to Salnave to keep. (Tr. 1801). Eldridge apparently told Khaimov that she would eventually let him go. Khaimov began to cry and begged to be released. At that point, Eldridge—without stopping the car—held her gun against Khaimov's temple and fired. (Tr. 1791–92). Once Khaimov began to bleed profusely onto the dashboard, Eldridge pulled the car over. She and Salnave then got out. (Tr. 1792–94). Eldridge pulled Khaimov out the car and, apparently realizing that he was still alive, "shot him in the head again at point-blank range." (Tr. 1795). To complete the savagery, Salnave took Khaimov's wallet, and the two drove away, leaving Khaimov to die. (Tr. 1796–97).

Now it was time to tidy up. Salnave and Eldridge stopped to clean Khaimov's blood from the front seat of the car. They also disposed of the shell casing expelled by Eldridge's first shot. Then they discarded Khaimov's sandals, which were left behind when his bloody body was dragged out of the car. (Tr. 1797–99). Their work done, the couple returned together to their room at the Jets Motel around 5 a.m. Salnave saw Baksh, their babysitter, out. Petitioner nervously confided to Baksh that "some crazy shit had happened," and offered Baksh a ride home—in his newly

4

acquired car—but Baksh declined. (Tr. 1955–56).

## B. Arrest

At the hour of Baksh's departure from the Jets Motel, around 5:40 a.m.,
Police Officer Patrick Roach responded to Captain Tilly Park, where he discovered
Khaimov's lifeless body. (Tr. 1105). Detective James Woods, who had previously
been responsible for investigating the Multani, Stewart, Canjura, and Camano
robberies, was asked to assist in the Khaimov case. (Tr. 894). Later that same day,
around 4:45 p.m., Detective Woods' investigation led him to the Jets Motel, where
he arrested Salnave. That evening, petitioner appeared in several lineups, and was
identified by Camano, Canjura, and Stewart. *See* (Tr. 2135). Subsequent to these
identifications, around 2:00 a.m. the next morning, Detectives Brian Quinn and
Louie Pia read Salnave his *Miranda* rights and began to interview him about the
robberies and the Khaimov murder.[5] Salnave admitted to being involved in the
robberies of Camano and Canjura, but denied any other wrongdoing. (Tr. 1299–
1301). Meanwhile, Detective Theodore Braun waited at the Jets Motel for Eldridge,
who returned around 3:00 a.m., shortly after the interview of Salnave began.
Eldridge then went to the precinct, where her children had been taken upon
Salnave's arrest. She voluntarily surrendered her gun and the keys to Khaimov's
BMW. (Tr. 1204–05). The gun recovered from Eldridge was later matched to the
bullet which killed Khaimov. (Tr. 1226–29).

With his girlfriend now also under arrest, Salnave's interviewers told him

---

[5] Salnave also signed a *Miranda* waiver. (Tr. 1278–81, 1285–87, 1298).

"we have the car, we have Tami, we have the gun, we have the keys," and that it was "time to think about what you're telling us." (Tr. 1302–03). Salnave's immediate reaction was that the detectives were "full of shit," but after he was showed the murder weapon and Khaimov's car keys, he told the detectives that he had killed Khaimov. (Tr. 1303–06). The detectives memorialized Salnave's statement, which he signed, and in which he claimed that he had acted alone in carjacking Khaimov. He also claimed that it was he who had shot Khaimov (but accidentally) after the victim began to struggle. (Tr. 1305–06). Salnave was presented with a picture of Khaimov. Petitioner identified it as a picture of the man he had killed. (Tr. 1347–48).

Eldridge did not walk away upon Salnave's confession. She was charged—under the same indictment as Salnave—with criminal possession of a weapon in the second and third degrees, criminal possession of stolen property in the fourth degree, and unauthorized use of a vehicle in the third degree. However, in January 2002, Eldridge also confessed to killing Khaimov. She was subsequently recharged under a separate indictment with murder and robbery, and, on August 12, 2002, pled guilty to all charges before Justice Robert J. Hanophy. In her allocution, Eldridge implicated Salnave by swearing that he had helped to plan, and had participated in, the robbery and murder of Khaimov. She also agreed not to testify at Salnave's trial in a manner inconsistent with that allocution. *See generally People v. Eldridge*, Ind. No. 1604/02 (Sup. Ct. Queens Cnty., Aug. 12, 2002).

### C. Trial, Conviction, and Appeal

Salnave's trial began before Justice William C. Donnino on February 4, 2003, and concluded on February 20. The People did not introduce Eldridge's plea

allocution implicating Salnave, or her sworn testimony that it was she who killed

Khaimov, but instead introduced and relied on Salnave's statement that it was he

who pulled the trigger. (Tr. 1315–19). Thereafter, petitioner called Eldridge as a

defense witness. She testified that she was responsible for Khaimov's murder, but

was inconsistent in her account of whether Salnave accompanied her or was aware

of her plans on that fateful night. Repeatedly, when asked on cross-examination

whether Salnave had participated in the robbery of Khaimov, Eldridge dissembled,

and responded equivocally, with statements to the effect of "according to my plea,

yes." *See, e.g.,* (Tr. 1813–14, 1819). However, on other occasions, she stated without

qualification that Salnave had been involved in the incident. *See, e.g.,* (Tr. 1781 (Q:

"Well, as you sit here now, is it your testimony under oath that Mr. Salnave was

present with you when you robbed Yuriy Khaimov?" A: "Yes.")). Eldridge testified

over the course of two full days of examination, during which defense counsel

repeatedly attacked her reliability and lack of consistency. *See, e.g.,* (Tr. 1807, 1809,

1812).[6] As a result of Eldridge's testimony on cross-examination, the prosecution

---

[6] In light of her inconsistent statements and hostility at Salnave's trial, Justice
Hanophy found, on April 30, 2003, that Eldridge had violated the conditions of her
guilty plea. *See People v. Eldridge,* Ind. No. 1604/02 (Sup. Ct. Queens Cnty. Apr. 30,
2003). Calling her a "loose cannon" and "a danger to others," he imposed a sentence
of 25 years to life for second-degree murder, as well as additional sentences for
robbery, possession of a weapon, possession of stolen property, tampering with
evidence, unauthorized use of a vehicle, assault (as a result of conduct while
incarcerated), and criminal contempt of court (after Eldridge told Justice Hanophy
"I'm a danger to you," "I should have killed you," and "fuck you, I should have
went to fucking trial" at sentencing). *Id.* Her conviction and sentence were upheld
by the Second Department on June 1, 2004. *People v. Eldridge,* 8 A.D.3d 294, 777
N.Y.S.2d 668 (2d Dep't 2004). The Court of Appeals denied leave to appeal on
September 2, 2004. *People v. Eldridge,* 3 N.Y.3d 705, 818 N.E.2d 675 (2004).

requested that the jury be charged with an "acting-in-concert" theory of criminal liability. On February 20, the jury found Salnave guilty on the charges of second degree murder and the robberies of Stewart, Camano, and Canjura.

Prior to sentencing, Salnave moved the trial court, pursuant to C.P.L. § 330.30, to set aside his conviction, which Justice Donnino denied on December 1, 2003. On December 10, Justice Donnino sentenced Salnave to an indeterminate term of 40 years to life imprisonment. The Appellate Division, Second Department, affirmed on January 27, 2007. *People v. Salnave*, 41 A.D.3d 872, 838 N.Y.S.2d 657 (2d Dep't 2007). The Court of Appeals denied leave on September 24, 2007. *People v. Salnave*, 9 N.Y.3d 926, 875 N.E.2d 900 (2007). On December 18, 2008, Salnave filed the instant petition for a writ of *habeas corpus*.

<u>Standard of Review</u>

Under the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996) ("AEDPA"), a writ of *habeas corpus* shall not issue with respect to any claim that was adjudicated on the merits in state court unless the state court's decision: (1) "was contrary to," or involved an unreasonable application of, "clearly established federal law" as determined by the United States Supreme Court, or, (2) "was based on an unreasonable determination of the facts" in light of the evidence presented. 28 U.S.C. § 2254(d); *see also Gutierrez v. McGinnis*, 389 F.3d 300, 304 (2d Cir. 2004) (describing this standard as "AEDPA deference"). AEDPA's deferential review applies whenever a state court disposes of a state prisoner's federal claim on the merits, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *Harrington v. Richter*,

131 S. Ct. 770, 785 (2011); *see also Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

Where AEDPA deference applies, "a state court's findings of fact are 'presumed to be correct' unless rebutted 'by clear and convincing evidence.'" *Drake v. Portuondo*, 553 F.3d 230, 239 (2d Cir. 2009) (quoting 28 U.S.C. § 2254(e)(1)). For the purposes of federal habeas review, "clearly established federal law" refers to the holdings, as opposed to dicta, of Supreme Court decisions in effect at the time of the relevant state court decision. *Williams v. Taylor*, 529 U.S. 362, 412 (2000). A state court decision is "contrary to clearly established federal law" within the meaning of § 2254(d) if it contradicts relevant Supreme Court precedent or arrives at a different conclusion based on "materially indistinguishable" facts. *Id.* at 405–06. A state court decision involves an "unreasonable application" of federal law if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of" the case. *Id.* at 413. In construing and applying federal law, even erroneous state court decisions, if deemed reasonable, will survive habeas review. *Id.* at 411. The state court decision need not be "so far off the mark as to suggest judicial incompetence" before habeas relief may be granted. *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotations omitted). However, a federal court may reverse a state court ruling only where it was "so lacking in justification that there [is no] possibility for fairminded disagreement." *Vega v. Walsh*, 669 F.3d 123 (2d Cir. 2012) (quoting *Harrington*, 131 S. Ct. at 786–87).

## A. Due Process Claims

Petitioner raises a series of grievances which he believes undermined the fairness of his trial, in violation of his right to due process. Assuming for argument's sake that all were preserved and properly exhausted, none of these claims—alone, or in concert—was resolved by a state court decision that was contrary to clearly established federal law, or based on an unreasonable determination of the facts. As a result, petitioner is not entitled to federal habeas relief.

### 1. *Limitation of Defense's Examination of Eldridge*

Petitioner first contends that his right of confrontation was violated when the trial court prevented him from impeaching Eldridge's testimony during re-re-direct examination. As noted above, Eldridge gave inconsistent statements about whether Salnave had been involved in the Khaimov robbery—some in contradiction to the allocution of facts given by her at the time of her guilty plea. Salnave complains that he was not afforded fair opportunity in his confrontation of Eldridge to elicit from her certain specific statements, made during her confession, that were inconsistent with unfavorable versions of the truth given at trial during cross-examination. In particular, petitioner argues that Eldridge's testimony had been at variance with

---

[7] Respondent submits that some of Salnave's claims are procedurally barred for purposes of federal habeas, highlighting the Second Department finding that some issues raised in petitioner's state collateral proceedings were unpreserved. It is also noted that the Appellate Division considered the merits of all of Salnave's claims, and found them wanting. *See Salnave*, 41 A.D.3d at 872.

her past statements with respect to where Salnave had been the night of the Khaimov killing, why the two were not together, how he had known the details about what took place, what transpired at the motel later on, and whether he had reacted to seeing Khaimov's BMW in the motel parking lot the next morning. *See* (Pet. Mem. 31).

To say the least, Eldridge's testimony was as explosive as it was unpredictable. Petitioner's constitutional grievance centers on the trial court's rulings in connection with defense counsel's third crack at the witness he himself had called. The trial court concluded that further re-questioning Eldridge about her plea allocution and post-arrest statements would have been uselessly repetitive. Though petitioner admits that his counsel had been allowed to "elicit that Eldridge had told the police that petitioner was not with her during the murder and had nothing to do with it or the robbery," petitioner contends that this ruling "limited testimony" essential to demonstrate the fullness of her inconsistency and the misleading picture it painted of his guilt. Decrying a double standard, petitioner argues that the prosecution, on the other hand, was afforded considerable latitude in its cross-examination of Eldridge.

Regarding excluded witness statements, the Second Circuit has held that

whether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist. In a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt. On habeas review, trial errors are subject to lenient harmless error review.

*Jones v. Stinson*, 229 F.3d 112, 120 (2d Cir. 2000) (internal quotations and citations omitted) (alterations in original). At the same time, a reviewing court must not lose sight of the fact that, in the context of cross-examination, or even direct examination of one's own witness, *see Chambers v. Mississippi*, 410 U.S. 284, 298 (1973), it is essential, under the Confrontation Clause of the Sixth Amendment, that a defendant in a criminal case be able to examine a witness to the extent necessary "to ensure the reliability of the evidence against [him] by subjecting it to rigorous testing." *Maryland v. Craig*, 497 U.S. 836, 845 (1990). Nevertheless, the confrontation guarantee by no means mandates an unrestricted podium: it does not, in the context of trial fairness, entitle a defendant to "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Trial courts have broad discretion to limit cross-examination in the interests of clarity and of avoiding repetition or harassment, and "[o]nly when this broad discretion is abused will [reversal of] a trial court's decision to restrict [] examination" be appropriate. *United States v. Rahman*, 189 F.3d 88, 132 (2d Cir. 1999) (citing *United States v. Maldonado–Rivera*, 922 F.2d 934, 956 (2d Cir. 1990)). "Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata*, 916 F.2d at 806 (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980), *cert. denied*, 449 U.S. 1034 (1980)).

By these standards, the limitations the trial court imposed during the

defense's re-re-direct examination of Eldridge included no improper limitation. More importantly, even if the Court were to find that the trial court did improperly limit Salnave's confrontation of Eldridge, the Court concludes that the trial judge would merely have arrived at the threshold of habeas relief. That is to say, petitioner would be at the habeas threshold if it appeared that "a reasonable jury might have received a significantly different impression of . . . credibility had [petitioner's] counsel been permitted to pursue his proposed line" of questioning. *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). The Court would not cross the threshold, of course, unless it then concluded the issue was exhausted and the state court's contrary decision was not entitled to AEDPA deference.

Salnave's improper limitation claim lies nowhere near the habeas threshold. Petitioner was afforded not one, but many, opportunities to fully and fairly attack Eldridge's testimony as incredible, and the witness's inconsistencies, dissembling, and obfuscations must have been plain to all who listened. Any further examination of Eldridge, after multiple rounds of re-direct and days of testimony, would clearly have been cumulative and repetitive. The trial court's conclusion to this effect was, therefore, sound, and, in any event, is clearly entitled to AEDPA deference.

2. *Evidence Respecting Salnave's Confession and Related Jury Charges*

On a different plane, the defense pursued the theory that Salnave's confession to the murder was either involuntary or purposely fabricated to protect Eldridge,

who Salnave believed to be pregnant with his child.[8] To that end, petitioner collaterally attacks the trial court's decisions not to allow him to present certain in support of that theory. He also attacks the trial court's related jury charge on the issue of voluntariness and truthfulness. The challenged evidentiary rulings amount, according to Salnave, to a violation of "the right of an accused to present a complete defense." (Pet. Mem. 37).

In one instance, Justice Donnino sustained an objection by the People, which challenged the relevance of questioning—directed to Detective Quinn—about whether Salnave had told him that Eldridge may be carrying his child; this testimony, petitioner argues, would have offered an explanation as to why Salnave's confession may have been falsely given. Relatedly, petitioner also argues that the trial court erroneously failed to admit into evidence a recording, taken after his confession, of petitioner asking for a lawyer before speaking to prosecutors (and after being re-read his *Miranda* rights). The recording, Salnave contends, would also have called his confession into question by suggesting that it had been given involuntarily.

As federal habeas claims, the arguments are meritless. Though the trial court did not allow the defense to question Detective Quinn about whether or not he and petitioner had discussed Eldridge's pregnancy, the court permitted Eldridge to testify that she had told Salnave that she was pregnant with his child. What

---

[8] Whether Eldridge actually was ever pregnant by Salnave is unclear, but she was not pregnant with his child at any time relevant to the case. *See* (Tr. 1727).

mattered was Salnave's state of mind, not Detective Quinn's. To the extent that the barred exchange was relevant at all, it was to show Salnave's state of mind, *i.e.*, that he had a reason to lie to protect Eldridge, which Eldridge's own testimony had already established. As noted above, the relevant standard to determine the constitutional propriety of a limitation on inquiry is "whether the omitted evidence . . . [would] create a reasonable doubt that did not otherwise exist." *Jones*, 229 F.3d at 120. While it is true that Detective Quinn might have confirmed Salnave's awareness as he made post-arrest statements of Eldridge's pregnancy, this omission does not create a constitutional violation in light of the entire record. Stated differently, the exclusion of this testimony which merely confirmed an earlier iteration of it could by no means have foreclosed reasonable doubt that would have otherwise existed. Obviously, AEDPA mandates deference to the rulings of the state courts to that effect.

Salnave's other evidentiary exclusion argument, regarding the electronic recording of his eventual invocation of the right to an attorney, is meritless. After validly waiving his *Miranda* rights and confessing to the crime, petitioner, some hours later, changed his mind about his right to representation and requested that an attorney be present for subsequent questioning. This request was, of course, understandable, and was honored. What is incomprehensible is Salnave's contention that the after-thought request had retroactively vitiated his earlier waiver and, by extension, the admissibility of his earlier confession. Plainly, the fact that petitioner much later asked for an attorney has utterly no relevance to whether

his earlier confession was voluntary, or his waiver valid under *Miranda.*

Finally, Judge Donnino's jury charge on Salnave's confession passes

constitutional muster with or without AEDPA deference. "In order to obtain a writ

of *habeas corpus* in federal court on the ground of error in a state court's

instructions to the jury on matters of state law, the petitioner must show not only

that the instruction misstated state law but also that the error violated a right

guaranteed to him by federal law." *Casillas v. Scully*, 769 F.2d 60, 63 (2d Cir. 1985);

*see also Davis v. Strack*, 270 F.3d 111, 123 (2d Cir. 2001). In other words, the

erroneous instruction must have "by itself so infected the entire trial that the

resulting conviction violates due process."*Cupp v. Naughten*, 414 U.S. 141, 147

(1973). No such deficiency of state or federal law exists here.

According to Salnave, the trial court failed to explicitly instruct the jury "that

it was their duty to assess the truthfulness of the statement, that the burden was on

the [prosecution] to prove the truthfulness of the statement, and that the standard of

proof was beyond a reasonable doubt." (Pet. Mem. 45). The challenged charge, as

given, instructed the jury that

> As judges of the facts, you alone determine the truthfulness and
> accuracy of the testimony of each witness. You must decide whether a
> witness told the truth and was accurate, or instead testified falsely or
> was mistaken. . . . If you find that any witness has intentionally testified
> falsely as to any material fact, you may disregard that witness's entire
> testimony, or you may disregard so much of it as you find was
> untruthful . . . . There is no particular formula for evaluating the
> truthfulness and accuracy of another person's statements or testimony.
> . . . You may consider whether a witness had or did not have a motive
> to lie. . . .

16

(Tr. 2209–14). The charge continued:

> Under our law, before you may consider any [confession], you must first be convinced beyond a reasonable doubt that the defendant made the statement, and that the defendant did so voluntarily. In determining whether a statement was made, you can apply the test of believability and accuracy that we have already discussed. . . . If you find beyond a reasonable doubt that the statement was voluntarily made, then you may consider that statement in your determination of whether or not the defendant is guilty . . . .

(Tr. 2221–23). Salnave complains that these instructions only made clear that the jury was responsible for weighing the believability of *witnesses*, and not out-of-court statements, such as Salnave's confession. Absent such explicit guidance, Salnave argues, the charge "led the jury to believe that there was no truthfulness issue" to be evaluated with regard to the confession—that, if voluntary, the confession was to be taken as categorically true.

The lament is wholly without merit. Viewed in its totality, the charge contained the instruction about the consideration of Salnave's confession that Salnave claim's the charge should have contained. The instruction was clearly proper under state law. As the Second Department noted on Salnave's direct appeal, New York law does not require the specificity petitioner demands: C.P.L. § 710.70 provides that "the defendant may adduce trial evidence and otherwise contend that [a confession] was involuntarily made . . . [in which case] the court must submit such issue to the jury under instructions to disregard such evidence upon a finding that the statement was *involuntarily* made." (emphasis added). In considering the statute, the Second Department had previously established that

> While it is true that a statement admitting guilt which is found to be
> voluntary must be evaluated by the jury for its truthfulness . . . C.P.L.
> 710.70 merely requires that, with respect to confessions, the jury be
> specifically instructed on the issue of voluntariness. Thus, insofar as the
> instant charge specifically instructed the jury on the voluntariness of
> the defendant's confession, and generally instructed the jury as to the
> standards by which it must evaluate the truthfulness of all evidence, we
> conclude that, the charge, taken as a whole, adequately set forth the
> legal standards that the jury had to apply in its evaluation of the
> defendant's statements.

*People v. Bowen*, 134 A.D.2d 356, 357, 520 N.Y.S.2d 834 (2d Dep't 1987); *see also*

*Bell v. Ercole*, No. 05-cv-4532, 2011 WL 5040436 (E.D.N.Y. 2011), *aff'd*, 471 F. App'x

17 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 229 (2012); *People v. Rabady*, 28 A.D.3d

794, 795, 812 N.Y.S.2d 884 (2d Dep't 2006) ("insofar as the court's charge

specifically instructed the jury on the voluntariness of the defendant's admission,

and generally instructed the jury as to the standards by which it must evaluate the

truthfulness of all witnesses and evidence, the charge as a whole adequately

conveyed the legal standards the jury was to apply in its evaluation of the

defendant's statements"). Simply, the jury was properly instructed under New York

law as to how it should consider Salnave's confession. Even if, moreover, the trial

court had reformulated its charge in accord with petitioner's argument here, there

is no "substantial likelihood that a properly instructed jury" would have acquitted

petitioner in this case. *Davis*, 270 F.3d at 131. Certainly, the writ cannot issue on this

claim.

### 3. *Prosecution's Trial Theory*

Petitioner also takes issue with an abrupt shift, he claims, in the prosecution's

trial strategy, occasioned by Eldridge's testimony that she had killed Khaimov. Petitioner was indicted, before Eldridge had confessed to the crime, on evidence, namely his confession, that he had been the one to pull the trigger. But, Salnave complains that, notwithstanding the grand jury presentment, he was convicted by the *petit* jury on evidence that he was liable as an accessory, rather than a principal actor. In attacking this shift in theory, Salnave claims to have been denied due process, as well as his Sixth Amendment right to fair notice of the criminal charges against him.[9]

Petitioner faults the prosecution for failing to amend or supersede the indictment to reflect Salnave's potential liability as an accomplice, rather than the principal actor, and for pursuing the principal actor theory at trial in the first place. Had he been indicted as an accomplice, Salnave submits, he would have had an entirely different theory of his defense at trial. Not addressed in the argument is the fact that it was the defense who called Eldridge—the witness who contradicted Salnave's confession.

New York law, in any case, does not require that an indictment for second

---

[9] Petitioner points generally to the Sixth Amendment right to fair notice, but relies also on the New York State Constitution, specifically, for the principle that a grand jury indictment provides "some means of ensuring that the crime for which the defendant is brought to trial is in fact the one for which he was indicted by the Grand Jury, rather than some alternative seized upon by the prosecution in light of subsequently discovered evidence." (Pet. Mem. 57 (quoting *People v. Iannone*, 45 N.Y.2d 589, 594, 384 N.E.2d 656 (1978))). Any state constitutional claim is not properly presented on this petition and, as to any such state claim, the Court expresses no view.

degree murder, charging a defendant as a principal, be amended or superseded to permit the prosecution to argue that the named defendant is liable under an acting-in-concert theory. New York's high court has consistently held that a defendant indicted as a principal can be convicted as an accessory. *See People v. Rivera*, 84 N.Y.2d 766, 770, 646 N.E.2d 1098 (1995). Accordingly, such a shift in the People's theory of prosecution does not deny a defendant his right to adequate notice of the charges against him for the purposes of federal review. *De Jesus v. Miller*, 323 F. Supp. 2d 547, 556 (S.D.N.Y. 2004); *see also Gaston v. Conway*, No. 06-civ-4365, 2008 WL 501339 (S.D.N.Y. 2008) ("because the acting-in-concert charge and the prosecutor's summation in this case did not impermissibly amend the indictment under state law, [petitioner] had adequate notice of the charges against him"), *report and recommendation adopted*, 2008 WL 1830755 (S.D.N.Y. 2008).

Petitioner also contends that "the People were not [] free to present proof at trial that virtually ruled out" their own initial theory that Salnave had himself killed Khaimov, and that the change prejudiced his defense. The contention is at odds with New York law. The argument also overlooks the fact, for one, that it was his own witness, Eldridge, and not a prosecution witness, who caused the paradigm shift. And, while Salnave complains that the prosecution accepted Eldridge's plea, and its allocution that she had shot Khaimov, only to later prosecute Salnave on the theory that he had shot Khaimov, this does not amount to a constitutional violation on some theory of perceived prosecutorial inconsistency. *See Bradshaw v. Stumpf*, 545 U.S. 175, 187 (2005) (where two defendants were each charged with murder, "the

precise identity of the triggerman was immaterial to [petitioner]'s conviction for aggravated murder" and the prosecution was not therefore inconsistent). Clearly, as New York's high court has observed, two defendants, each charged with murder, cannot defend one another by each claiming that they themselves pulled the trigger. Where the dueling confessions of two defendants "implicat[e] not only themselves but also each other, the People [cannot] know who the shooter was . . . [and] should not have to choose one defendant over the other to prosecute as the shooter." *People v. Mateo*, 2 N.Y.3d 383, 402–04, 811 N.E.2d 1053 (2004). In short, Eldridge's allocution, which implicated petitioner, could not bar the prosecution in Salnave's case from advancing the theory—handed to the People by petitioner's own confession—that he was the shooter at a trial that also featured evidence that he acted in concert with Eldridge as *she* pulled the trigger.

Lastly, even if the foregoing were not so, petitioner cannot claim to have been prejudiced by an unexpected upheaval in strategy and preparation caused by an abrupt shift in the prosecution case. To be sure, Eldridge's testimony was predictable. Petitioner was on notice pre-trial that Eldridge had sworn to petitioner's involvement in the robbery and murder. To put Eldridge on the stand— as petitioner, and not the People, did—was to ensure that the issue of acting-in-concert would become a central issue of the case. That is so even if the People had not initially proceeded on that theory.[10] Simply, Salnave's defense case caused the

_____

[10] On that score, the prosecution had informed petitioner in 2002 that, should he call

21

People to shift from one permissible theory of prosecution to another, and he cannot now, in good faith, claim unfair surprise. For these reasons, petitioner's due process rights were not infringed by the prosecution's theory. This claim, too, does not survive AEDPA review.

### 4. *Insufficiency of Evidence*

With respect to his conviction for robbing Stewart, Salnave urges that the evidence at trial was insufficient to permit a guilty verdict. In considering a claim of insufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Indeed, "[o]nly when the record is totally devoid of evidentiary support is a due process issue raised and *habeas corpus* relief warranted." *Gonzalez v. Reiner*, 177 F. Supp. 2d 211, 218 (S.D.N.Y. 2001) (citing *Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir. 1994)). As little as simple inference and circumstantial evidence will permit a verdict to stand. *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993).

In New York, a defendant is guilty of second degree robbery when he "forcibly steals property" and is either armed with a deadly weapon or displays

---

Eldridge as a defense witness at trial, the prosecution reserved the right to request jury charges on acting-in-concert liability. Petitioner now strenuously objects that he was unaware of the prosecution's letter to this effect, though that letter has been produced as part of the record, and was indeed sent to petitioner's counsel at the time.

what appears to be a pistol or other firearm. N.Y. Penal Law § 160.15. There is no dispute that Stewart's property—her purse—was forcibly stolen by a man who threatened her with what appeared to be a pistol, stuck in the back of her head. What Salnave argues, then, is that no evidence will support the conclusion, beyond a reasonable doubt, that he was the man who committed the crime. He is wrong. Stewart, the victim, identified Salnave, both in a lineup and at trial, as the man who robbed her. (Tr. 668,671–72). It is axiomatic that "the testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction." *United States v. Danzey*, 594 F.2d 905, 916 (2d Cir. 1979). And, though Stewart's testimony at trial betrayed some inconsistencies in her recollection of the lineup at which she identified Salnave, "[w]here there are conflicts in testimony, [a reviewing court] must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994). Given the exacting standards of deference mandated by AEDPA, the jury's determinations of Stewart's credibility—and the state court's ratification of them as a matter of fact and law are more than enough to satisfy *Jackson* and to deny habeas relief on this claim.

## B. Ineffective Assistance of Counsel

As has become the norm, Salnave last targets his trial counsel—apparently the fifth lawyer assigned to him during the pendency of the prosecution. Specifically, he claims counsel was inadequately prepared to represent him.

In order to prevail on a claim of ineffective assistance, a petitioner must

"meet both a 'performance' test, showing that counsel's representation 'fell below an objective standard of reasonableness,' and a 'prejudice' test, demonstrating that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Palacios v. Burge*, 589 F.3d 556, 561 (2d Cir. 2009) (quoting *Strickland v. Washington*, 466 U.S. 688, 694 (1984)); *see also Cullen v. Pinholster*, 131 S. Ct. 1388, 1404 (2011), *reh'g denied*, 131 S. Ct. 2951 (2011) ("[R]easonable probability" has been defined as "a 'substantial,' not just 'conceivable,' likelihood of a different result." (quoting *Harrington*, 131 S. Ct. at 791)). Because of the inherently deferential nature of the *Strickland* standard, "[a] criminal defendant has a high burden to overcome to prove the deficiency of counsel." *Lynn v. Bliden*, 443 F.3d 238, 247 (2d Cir. 2006). For habeas petitioners, this burden is "enhanced by the hurdle posed by the highly deferential review accorded state court adjudications under [AEDPA]." *Mosby v. Senkowski*, 470 F.3d 515, 519 (2d Cir. 2006) (quoting *Eze v. Senkowski*, 321 F.3d 110, 112 (2d Cir. 2003)); *see also Pinholster*, 131 S. Ct. at 1403 (The standard of review for ineffective assistance claims in the habeas context is "doubly deferential" because courts take a "highly deferential look at counsel's performance through the deferential lens of § 2254(d)." (internal citations omitted)).

Petitioner's complaints about the adequacy of his trial representation are entirely without merit. For one, any charge that Salnave's trial counsel was unprepared for trial is immediately discredited by the record. From jury selection to closing statements, as well as in an aggressively-composed § 330.30 motion, counsel deployed a vigorous, well-reasoned, and tactically insightful defense. Then,

as to Salnave's observation that counsel failed to preserve certain claims for the purposes of a § 330.30 motion, such oversights were by no means prejudicial. In deciding the § 330.30 motion, Justice Donnino reached the merits of all of Salnave's claims—including those not technically preserved—and rejected them substantively. Similarly, the Appellate Division reached the merits of other ostensibly unpreserved claims, which Salnave faulted counsel for failing to pursue, and again adjudged them meritless. *See Salnave*, 41 A.D.3d at 873–74.

It is well-settled, furthermore, that a failure to "raise an otherwise futile objection could not have rendered counsel ineffective." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005); *United States v. Eltayib*, 88 F.3d 157, 170 (2d Cir. 1996) ("Given the weight of the evidence, [defendant] cannot demonstrate that his case was prejudiced by his counsel's failure to adopt what was in any event an unpromising defense strategy."). Taking all of these reasons together, it is manifestly obvious that even if fully exhausted, the finding of the state courts that petitioner was not denied the effective assistance of counsel would be entitled to AEDPA deference. Salnave's federal claim of ineffective assistance, as a result, is entirely without merit.

## Conclusion

For the foregoing reasons, Salnave's application for a writ of *habeas corpus* is denied and his petition is dismissed.

Since petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability shall not issue. 28 U.S.C. § 2253(c)(2).

Additionally, the Court certifies pursuant to 28 U.S.C. § 1915(a) that any appeal from this Memorandum and Order would not be taken in good faith, and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

The Clerk of Court is directed to enter judgment for respondent and to close this case.

SO ORDERED.

Dated:    Brooklyn, New York
            June 19, 2014

ERIC N. VITALIANO
United States District Judge